**KALIELGOLD PLLC**
Jeffrey D. Kaliel (SBN 238293)
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 280-4783
jkaliel@kalielpllc.com

**KALIELGOLD PLLC**
Sophia G. Gold (SBN 307971)
950 Gilman Street, Suite 200
Berkeley, CA 94710
Telephone: (202) 350-4783
sgold@kalielgold.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330990)
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsberglaw.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELI SILVA, on behalf of himself and all others similarly situated, | Case No. 3:24-cv-02890-SK |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT WHALECO INC.'S MOTION TO COMPEL ARBITRATION** |
| v. | |
| WHALECO, INC., d/b/a TEMU, | **Judge: Hon. Sallie Kim** |
| Defendant. | **Date: September 16, 2024** |
| | **Time: 9:30 a.m.** |
| | **Courtroom: C** |

Plaintiff Eli Silva ("Plaintiff"), by and through his counsel, hereby submits the following opposition to Defendant Whaleco, Inc., d/b/a Temu's ("Temu," or "Defendant") Motion to Compel Arbitration (the "Motion") and states as follows:

# **<u>TABLE OF CONTENTS</u>**

Page

I.      INTRODUCTION ................................................................ 1

II.     BACKGROUND ................................................................ 2

        A.      Temu Deceives Consumers by Falsely Advertising its Products for Sale at Sham Discounts on its Online Marketplace ................................ 2

        B.      Temu's Evidence Submitted With its Motion is Insufficient to Meet its Burden to Prove its Registration Prompts Provided Plaintiff Adequate Notice of Arbitration ................................................................ 4

        C.      Temu's Arbitration Agreement is Unconscionable and Unenforceable ....... 5

III.    DEFENDANT'S MOTION TO COMPEL ARBITRATION MUST BE DENIED ... 6

        A.      Legal Standard ................................................................ 6

        B.      The Question of Arbitrability is for the Court to Decide—Not an Arbitrator ................................................................ 8

        C.      No Agreement to Arbitrate Was Formed Between the Parties Because Temu Failed to Meet its Burden to Prove that Plaintiff Was on Notice of Temu's Terms and Assented to be Bound ................................................ 9

                1.      The Trinh Declaration is Insufficient to Prove Plaintiffs Agreed to Temu's Terms and Arbitration Agreement ................................ 10

        D.      Temu's Arbitration Agreement is Unconscionable and Unenforceable ....... 15

                1.      Temu's Arbitration Agreement is Procedurally Unconscionable ..... 15

                2.      Temu's Arbitration Agreement is Substantively Unconscionable .... 16

                3.      The Arbitration Agreement Cannot Be Saved Through Severance ................................................................ 19

        E.      Defendant's Class Action Waiver is Unenforceable Once Divorced from its Arbitration Agreement ................................................ 21

IV.     Conclusion ................................................................ 21

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**CASES**

4

5

*Abramson v. Juniper Networks, Inc.,*
  115 Cal. App. 4th 638 (2004) ........................................................................16

6

*Ahlstrom v. DHI Mortgage Company, Ltd., L.P.,*
  21 F.4th 631 (9th Cir. 2021) ...........................................................................6

7

*Armendariz v. Found. Health Psychare Servs., Inc.,*
8
  24 Cal. 4th 83 (2000) ..........................................................................15, 19, 20

9

*Belyea v. GreenSky, Inc.,*
  2020 WL 3618959 (N.D. Cal. July 2, 2020) ...................................................8

10

Berman v. Freedom Fin. Network, LLC
11
  30 F.4th 849 (9th Cir. 2022) .........................................................7, 8, 11, 12

12

*Binder v. Michael Kors (USA), Inc.,*
  No. 23 Civ. 3941 (DEH), 2024 WL 3227943 (S.D.N.Y. June 28, 2024) ...............3

13

*Calcagno v. Kipling Apparel Corp.,*
14
  No. 23-cv-2247-BAS-BLM, 2024 WL 3261205 (S.D. Cal. July 1, 2024) ...............3

15

*Camping Const. Co. v. District Council of Iron Workers,*
  915 F.2d 1333 (9th Cir. 1990) .........................................................................7

16

*Chabolla v. ClassPass Inc.,*
17
  2023 WL 4544598 (N.D. Cal. June 22, 2023) .........................................7, 11, 14

18

*Chavarria v. Ralphs Grocery Co.,*
  733 F.3d 916 (9th Cir. 2013) .........................................................................15

19

*Coinbase, Inc. v. Suski,*
20
  144 S. Ct. 1186 (2024) .....................................................................................6

21

*Dahlin v. Under Armour, Inc.,*
  No. 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020) ...............3

22

*Dietrich v. Boeing Co.,*
23
  14 F.4th 1089 (9th Cir. 2021) .........................................................................2

24

*Discover Bank v. Super. Ct.,*
  36 Cal. 4th 148 (Cal. 2005).............................................................................21

25

*Eiess v. USAA Fed. Sav. Bank,*
26
  404 F. Supp. 3d 1240 (N.D. Cal. 2019) ...........................................................8

27

*Farmer v. BarkBox, Inc.,*
  2023 WL 8522984 (C.D. Cal. Oct. 6, 2023) ...................................................13

28

*First Options of Chicago, Inc. v. Kaplan,*
514 U.S. 938 (1995).................................................................................7, 8

*In re Axos Bank Litig.,*
No. 23-cv-2266-RSH-SBC (S.D. Cal. July 11, 2024) .........................................10

*Jackson v. S.A.W. Entertainment Ltd.,*
629 F. Supp. 2d 1018 (N.D. Cal. 2009) ...........................................20

*Keebaugh v. Warner Bros. Entertainment Inc.,*
100 F. 4th 1005 (9th Cir. 2024) .....................................................14

*Kum Tat Ltd. v. Linden Ox Pasture, LLC,*
845 F.3d 979 (9th Cir. 2017) .........................................................8

*Long v. Provide Com., Inc.,*
245 Cal. App. 4th 855 (2016) ........................................................7

*Lopez v. Dave Inc.,*
No. 22-cv-04160-VC, 2022 WL 17089824 (N.D. Cal. Nov. 21, 2022), *aff'd* No.
22-16915, 2023 WL 8594393 (9th Cir. Dec. 12, 2023).......................10, 13

*Lopez v. Dave, Inc.,*
No. 22-16915, 2023 WL 8594393 (9th Cir. Dec. 12, 2023)..................8

*MacClelland v. Cellco Partnership,*
609 F. Supp. 3d 1024 (N.D. Cal. July 1, 2022) ...................2, 9, 16, 17, 18, 20

*Meyer v. Uber Techs, Inc.,*
868 F.3d 66 (2d Cir. 2017)..............................................................7

*Morgan v. Sundance, Inc.,*
142 S. Ct. 1708, 1713 (2022) .........................................................7

*Nabiyev v. Closet World, Inc.,*
No. 2:23-cv-02218-ODW (PDx), 2023 WL 7927739 (C.D. Cal. Nov. 16, 2023).........3

*Newton v. American Debt Services, Inc.,*
854 F. Supp. 2d 712 (N.D. Cal. 2012) .........................................16

*Nunez v. Saks Incorporated,*
No. 15-cv-2717 JAH(WVG), 2023 WL 3485263 (S.D. Cal. May 16, 2023)..........3

*Oberstein v. Live Nation Entertainment, Inc.,*
60 F. 4th 505 (9th Cir. 2023) .......................................................14

*OTO,*
8 Cal. 5th at 130 .........................................................................16

*Pandolfi v. AviaGames, Inc.,*
2024 WL 3558853 (N.D. Cal. July 26, 2024)...............9, 16, 17, 18, 20

*Pokorny v. Quixtar, Inc.,*
601 F.3d 987 (9th Cir. 2010) .......................................................16

OPPOSITION TO MOTION TO COMPEL ARBITRATION

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012)............................................................................................7

*Sellers v. JustAnswer LLC*,
    73 Cal. App. 5th 444 (2021) ....................................................................................7, 11

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    498 F.3d 976 (9th Cir. 2007) .........................................................................................21

*Snow v. Eventbrite, Inc.*,
    No. 3:20-cv-3698-WHO, 2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ............................10

*Stover v. Experian Holdings, Inc.*,
    978 F.3d 1082 (9th Cir. 2020). ........................................................................................8

*Suski v. Marden-Kane, Inc.*,
    2022 WL 3974259 (N.D. Cal. Aug. 31, 2022) ...................................................................21

*Swain v. LaserAway Medical Group, Inc.*,
    57 Cal. App. 5th 59 (2020) ............................................................................................16

*Ting v. AT & T*,
    319 F.3d 1126 (9th Cir. 2003) ........................................................................................15

*Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, 2024 WL 64747 (N.D. Cal.
    Jan. 5, 2024) ..................................................................................................................3

*Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
    489 U.S. 468 (1989)........................................................................................................6

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.*,
    485 F. Supp. 3d 1168 (N.D. Cal. 2020) ...........................................................................20

**STATUTES**

16 C.F.R. § 233.5 ....................................................................................................................3

Cal Civ Code 1670.5(a) .........................................................................................................19

Cal. Bus. & Prof. Code §§ 17200 ............................................................................................3

Cal. Bus. & Prof. Code §§ 17500 ............................................................................................4

Cal. Civ. Code §§ 1750...........................................................................................................3

## I. **INTRODUCTION**

Temu employs a deceptive, phantom discount pricing scheme for one reason: to induce consumers to purchase products on Temu's online marketplace under the false premise that they are receiving a bargain. Temu contrives an artificially inflated strikethrough price and then substantially discounts it to a "sale" price to lure consumers into purchasing products they believe to be on sale. Temu's pricing is fictitious: Temu has never offered these products for sale at their original prices, or at least not for a reasonable amount of time under California law. In an attempt to avoid litigating the merits of these well-established claims on a class-wide basis, Temu now seeks to arbitrate those claims on the grounds that Temu's Terms of Use (the "Terms") contain an Arbitration Agreement. But Temu's Motion must be denied for two independent reasons.

First, Temu has failed to satisfy its burden to prove that Plaintiff unambiguously agreed to arbitrate his claims with Temu. Temu has not presented any evidence that Plaintiff had actual notice of the Arbitration Agreement, and Plaintiff attests that he was never aware of those Terms. In the absence of actual notice, Temu must prove that its Terms were reasonably conspicuous such that consumers were on inquiry notice. But Temu has similarly failed to prove Plaintiff had reasonable notice of the Arbitration Agreement when it has submitted only inadequate and inadmissible evidence through the Declaration of Michael Trinh ("Trinh Decl."). Indeed, Trinh attaches screenshots from Temu's registration process, but fails to attest that those Registration Prompts are the same ones Plaintiff would have been exposed to in February 2024 when he purportedly registered his Temu account. This alone is reason to deny the Motion. In any event, even if the proffered Registration Prompts were accurate, they still fail to put Plaintiff on notice of Temu's Terms and Arbitration Agreement because they are not presented in a reasonably conspicuous manner. In the absence of reasonably conspicuous notice, there can be no assent, and arbitration cannot be compelled.

Second, even if Temu provided sufficient evidence to prove Plaintiff agreed to arbitrate (it did not), Temu's Arbitration Agreement and delegation clause are unenforceable because they are procedurally and substantively unconscionable under California law. Specifically, Temu has drafted an Arbitration Agreement that forces consumers to submit to a one-sided mandatory batching arbitration procedure and a pre-arbitration conference that are intentionally designed to create an

inferior forum and substantially delay consumers' access to justice. While arbitration was designed to be a mechanism for expedient resolution, Temu's batching procedure and pre-arbitration conference have the reverse effect. Thousands of similar claims have already been filed in the AAA against Temu involving similar claims that are alleged in this class action regarding Temu's deceptive advertising practices. Declaration of Sophia G. Gold ("Gold Decl."), ¶ 3. Thus, Plaintiff's case will inevitably be batched into these other cases, resulting in indefinite delay. As Judge Edward M. Chen of this Court recently noted in invalidating a similar provision for the same reason, "justice delayed is justice denied." *MacClelland v. Cellco Partnership,* 609 F. Supp. 3d 1024, 1042 (N.D. Cal. July 1, 2022) (quoting *Dietrich v. Boeing Co.,* 14 F.4th 1089, 1095 (9th Cir. 2021)).

While Temu was free to include a fair and reasonable Arbitration Agreement in its Terms, as many companies do, it instead exploited its superior bargaining power for its own benefit, resulting in a one-sided Arbitration Agreement that is blatantly unfair and unconscionable. And when Temu affirmatively excluded its batching provision from its severability clause, instead providing for a poison pill that requires the Court to invalidate Temu's *entire* Arbitration Agreement in the event the batching provision is found invalid, this Court must invoke that poison pill and deny Temu's Motion.

## II.   BACKGROUND

### A.   Temu Deceives Consumers by Falsely Advertising its Products for Sale at Sham Discounts on its Online Marketplace

Plaintiff's putative class action is brought on behalf of himself and similarly situated consumers against Temu for its advertising of misleading strikethrough prices, fictitious savings, and fake-limited time offers for hundreds of products sold exclusively on its online marketplace. *See generally,* Class Action Complaint ("Compl."). The Complaint alleges that Temu creates an illusion of savings on its website by advertising a strikethrough price—i.e., the product's full, non-discounted former price—which it typically displays in strikethrough typeface (e.g., ~~$5.00~~)—adjacent to its currently offered "sale" price in larger, bolder, font, often using a contrasting color. *Id.* ¶¶ 25-26.

Additionally, Temu imparts a false sense of urgency on prospective customers by prominently displaying the purported savings on its website with phrases such as "Lightning deals" and "Limited time offer" to make consumers more likely to buy the product before the fictitious sale expires. *Id.* ¶¶

37-40. Temu's pricing scheme misleads consumers because the savings advertised on its website (which are based on the advertised strikethrough prices) do not represent the actual savings customers receive—as Plaintiff and reasonable consumers understand that term—because they do not represent the actual prices at which the Products were ever sold or offered for sale for a reasonable period of time. *Id.* ¶¶ 32-33.

For example, Plaintiff purchased two electric massager guns advertised with an original, strikethrough price of $15.59, and offered at a discount for $6.29 each. *Id.* ¶¶ 46-47. Plaintiff made his purchase in reliance on Defendant's misrepresentations and omissions that by purchasing the electric massager guns, he would be saving a total of $18.60 or a value of nearly 60%. *Id.* ¶¶ 49-56. Upon information and belief, however, Defendant sold the electric massager guns at a false discount because Temu never sold those products for the full price of $15.59 each for a reasonably substantial period time, if ever at all. *Id.* ¶¶ 54, 56.

The FTC has issued guidance against "deceptive pricing" schemes like Temu's and have cautioned that "[Retailers] should not offer an advance sale under circumstances where they do not in good faith expect to increase the price at a later date, or make a 'limited' offer which, in fact, is not limited." *Id.* ¶ 35 (quoting 16 C.F.R. § 233.5). Numerous courts throughout the country have upheld these claims on motions to dismiss.[1]

The Complaint asserts claims for violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code

---

[1] *See e.g., Vizcarra v. Michaels Stores, Inc.,* No. 23-cv-00468-PCP, 2024 WL 64747 (N.D. Cal. Jan. 5, 2024) (upholding FAL, UCL, and CLRA claims); *Calcagno v. Kipling Apparel Corp.,* No. 23-cv-2247-BAS-BLM, 2024 WL 3261205 (S.D. Cal. July 1, 2024) (same); *Binder v. Michael Kors (USA), Inc.,* No. 23 Civ. 3941 (DEH), 2024 WL 3227943 (S.D.N.Y. June 28, 2024) (same); *Nabiyev v. Closet World, Inc.,* No. 2:23-cv-02218-ODW (PDx), 2023 WL 7927739 (C.D. Cal. Nov. 16, 2023) (same); *Nunez v. Saks Incorporated,* No. 15-cv-2717 JAH(WVG), 2023 WL 3485263 (S.D. Cal. May 16, 2023) (same); *Dahlin v. Under Armour, Inc.,* No. 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020) (same).

1    §§ 17500, *et seq.*; and unjust enrichment on behalf of a Nationwide Class and Consumer Subclass.

2    *Id.*, ¶¶ 57-102.

3        **B.    Temu's Evidence Submitted With its Motion is Insufficient to Meet its Burden to Prove its Registration Prompts Provided Plaintiff Adequate Notice of Arbitration**

4

5        Temu argues Plaintiff was put on notice of Temu's Terms and Arbitration Agreement when

6    he registered with Temu before making his purchase on its website. Mot. at 2-4. In support of this

7    contention, Temu submits the Trinh Declaration, which inserts two screenshots of Temu's

8    "Registration Prompts." (ECF No. 17-1.)   For illustrative purposes, these screenshots are taken

9    directly from the Motion and incorporated below:



22    Registration Prompt #1 and #2, respectively. *See* Mot. at p. 3-4.

23        However, as explained further below, the Trinh Declaration and accompanying screenshots

24    are critically deficient because they lack foundation and thus, should be excluded, or at a minimum,

25    given little to no weight.[2] Specifically, it is unclear that these screenshots were the same Registration

26    _____

27    [2] Plaintiff's Objections to Evidence Defendant Submitted with Motion to Compel Arbitration is submitted concurrently herewith.

28

1    Prompts in effect at the time Plaintiff registered his account with Temu, as Trinh is entirely silent as

2    to this fact, and Plaintiff disputes that he assented to the same. *See* Declaration of Eli Silva (Silva

3    Decl."), ¶¶ 6-7.

4         **C.      Temu's Arbitration Agreement is Unconscionable and Unenforceable**

5         Temu's Terms contain an Arbitration Agreement equipped with unconscionable provisions

6    that are strategically designed to delay justice to consumers. First, and foremost, Temu's Arbitration

7    Agreement includes a one-sided, mandatory "Batch Arbitration" provision (the "Batching Provision")

8    that requires, in instances where "there are twenty-five (25) or more individual Arbitration Notices of

9    a substantially similar nature filed against" Temu "by or with the assistance of the same law firm,

10   group of law firms, or organizations within a thirty (30) day period," the AAA to "administer the

11   arbitration demands in batches of 100 Arbitration Notices per batch." *See* Trinh Decl., Ex. A at §

12   19.9. The full text of that provision states:

13   **19.9 Batch Arbitration.** To increase the efficiency of administration and resolution of arbitrations, you and we agree that in the event that there are twenty-five

14   (25) or more individual Arbitration Notices of a substantially similar nature filed against us by or with the assistance of the same law firm, group of law firms, or
     organizations, within a thirty (30) day period, AAA shall (1) administer the arbitration demands in batches of 100 Arbitration Notices per batch (plus, to the
     extent there are less than 100 Arbitration Notices left over after the batching described above, a final batch consisting of the remaining Arbitration Notices), or in

15   a single batch if there are fewer than 100 Arbitration Notices in total; (2) appoint one arbitrator for each batch; (3) administer the batches concurrently; (4)
     provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural

16   calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("Batch Arbitration"). Arbitration awards in one batch of
     arbitration demands shall have no precedential effect on subsequently administered batches.

17   All parties agree that Arbitration Notices are of a "substantially similar nature" if they arise out of or relate to the same event or factual scenario and raise the
     same or similar legal issues and seek the same or similar relief. To the extent the parties disagree on the application of the Batch Arbitration process, the

18   disagreeing party shall advise AAA, and AAA shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process
     ("Administrative Arbitrator"). In an effort to expedite resolution of any such dispute by the Administrative Arbitrator, the parties agree the Administrative

19   Arbitrator may set forth such procedures as are necessary to resolve any disputes promptly. The Administrative Arbitrator's fees shall be paid by us. You and we
     agree to cooperate in good faith with AAA to implement the Batch Arbitration process including the payment of single filing and administrative fees for batches

20   of Arbitration Notices, as well as any steps to minimize the time and costs of arbitration, which may include: (1) the appointment of a discovery special master to
     assist the arbitrator in the resolution of discovery disputes; and (2) the adoption of an expedited calendar of the arbitration proceedings. This Batch Arbitration

21   provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or
     consolidated claims under any circumstances, except as expressly set forth in this provision.

22

23   *Id*. The Batching Provision further contains a poison pill that invalidates the *entire* Arbitration

24   Agreement in the event a Court finds the Batching Provision unenforceable for any reason:

25   **19.11 Invalidity, Expiration.** Except as provided in Section 19.9, if any part or parts of this Arbitration Agreement are found under the law to be invalid or
     unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall

26   continue in full force and effect. For the avoidance of doubt, this means that, if Section 19.9 is found under the law to be invalid or unenforceable to any extent,
     then you agree that the entire Arbitration Agreement shall be of no force and effect. You further agree that any Dispute that you have with us as detailed in this

27   Arbitration Agreement must be initiated via arbitration within the applicable statute of limitation for that claim or controversy, or it will be forever time barred.
     Likewise, you agree that all applicable statutes of limitation will apply to such arbitration in the same manner as those statutes of limitation would apply in the

28   applicable court of competent jurisdiction.

*Id.* at § 19.11.

Second, the Arbitration Agreement also contains a pre-arbitration requirement that, when coupled with the Batching Provision, creates further undue delay by requiring each individual consumer to "personally" attend by phone or video an "Informal Dispute Resolution Conference" before they may initiate arbitration:

**19.2 Informal Dispute Resolution.** There may be instances when a Dispute arises between you and us. If that occurs, we are committed to working with you to reach a reasonable resolution. You and we agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and we therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("Informal Dispute Resolution Conference"). If you are represented by counsel, your counsel may participate in the conference, but you also agree to participate in the conference. The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ("Notice"), which shall occur within forty-five (45) days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties in writing. Notice to us that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to dispute@temu.com, or by regular mail to the applicable address set forth in Section 18.5. The Notice must include: (1) your name, telephone number, mailing address, email address associated with your Account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute.

*Id.* at § 19.2; *see also id.* ("Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration.") This provision requires that these Conferences be held separately "each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users" and even where there are "multiple individuals initiating a Dispute." *Id.*

### III.    DEFENDANT'S MOTION TO COMPEL ARBITRATION MUST BE DENIED

####     A.    Legal Standard

The United States Supreme Court recently reaffirmed that "[a]rbitration is a matter of contract and consent, and we have long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski,* 144 S. Ct. 1186, 1191 (2024). Indeed, the Federal Arbitration Act (the "FAA") "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 478 (1989); *see also Ahlstrom v. DHI Mortgage Company, Ltd., L.P.,* 21 F.4th 631, 634 (9th Cir. 2021) ("The cardinal precept of arbitration is that it is simply a matter of contract between the parties").

As such, the Court must first "determine whether a contract *ever* existed; unless that issue is decided in favor of the party seeking arbitration, there is no basis for submitting any question to an arbitrator." *Camping Const. Co. v. District Council of Iron Workers,* 915 F.2d 1333, 1340 (9th Cir.

1990). To determine whether the parties formed a valid agreement to arbitrate, courts generally "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995). Under California law,[3] "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444, 461 (2021) (quoting *Long v. Provide Com., Inc.,* 245 Cal. App. 4th 855, 862 (2016)).

Importantly, the Supreme Court has also recently held that the FAA further prohibits courts from adopting any "special, arbitration-preferring procedural rules" that "tilt the playing field in favor of (or against) arbitration." *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713–14 (2022). This new precedent is significant because it supersedes prior case law suggesting that there is a liberal policy in favor of arbitration, or that the FAA requires the court to construe contracts in favor of arbitration. *Id.* at 1713. Rather, every court, including this Court, must consider the arbitration clause just as it would consider any other contract term, and "may not devise novel rules to favor arbitration over litigation." *Id.*

Temu, as the party moving to compel arbitration, bears the burden to prove that a valid, enforceable agreement to arbitrate was formed by a preponderance of the evidence. *Stover v. Experian*

---

[3] Temu's Terms contain a Choice of Law provision providing that the "Terms and any dispute of any sort that might arise between" the parties "be governed by the laws of the State of New York[.]" *See* Trinh Decl., Ex. A at § 18.3. Plaintiff's position is that California law governs—the law of the state in which the contract was allegedly formed—and that New York cannot apply unless and until the Court determines that a valid agreement to arbitrate was in fact formed in the first instance. *See Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."). Nevertheless, as the Ninth Circuit noted in *Berman v. Freedom Fin. Network, LLC,* since "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term,'" the court "need not decide which State's law governs 'because both California and New York law dictate the same outcome.'" 30 F.4th 849, 855 (9th Cir. 2022) (quoting *Meyer v. Uber Techs, Inc.,* 868 F.3d 66, 74 (2d Cir. 2017)). As such, this Court "need not decide whether to apply California or New York law as the end result is the same." *Chabolla v. ClassPass Inc.,* 2023 WL 4544598, at *3 (N.D. Cal. June 22, 2023).

*Holdings, Inc.,* 978 F.3d 1082, 1086 (9th Cir. 2020). And when ruling on this motion, the court must afford the non-movant "the benefit of all reasonable doubts and inferences." *Lopez v. Dave, Inc.,* No. 22-16915, 2023 WL 8594393, at *1 (9th Cir. Dec. 12, 2023) (citations omitted). As demonstrated below, Temu has failed to make this showing.

**B.**     **The Question of Arbitrability is for the Court to Decide—Not an Arbitrator**

As a preliminary matter, the question of whether an agreement to arbitrate has been formed must be decided by the Court and cannot be delegated to an arbitrator. It is undisputed there is a strong and long-standing presumption that courts, not arbitrators, determine threshold questions of arbitrability. *First Options,* 514 U.S. at 944-45.

Plaintiff recognizes that Temu's Arbitration Agreement purports to contain a delegation clause which Defendant argues delegates issues pertaining to scope and enforceability to the arbitrator. Mot. at 6; *see* Trinh Decl., Ex. A at § 19.7. In the unlikely event this dispute is sent to arbitration, Plaintiff intends to contest the enforceability of the Arbitration Agreement in front of the arbitrator. *See infra.* The threshold inquiry here is whether a valid agreement to arbitrate was formed in the first instance—a question that this Court, and not the arbitrator, must answer. *See Kum Tat Ltd. v. Linden Ox Pasture, LLC,* 845 F.3d 979, 983 (9th Cir. 2017) ("challenges to the very existence of the contract are, in general, properly directed to the court"); *Eiess v. USAA Fed. Sav. Bank,* 404 F. Supp. 3d 1240, 1248 (N.D. Cal. 2019) ("The issue of contract formation, however, is not a delegable gateway issue. The fundamental threshold question of whether there exists a binding contract (of which an arbitration clause is a part) cannot be delegated because it cannot be assumed that a delegation clause contained therein must be given effect. In other words, if a contract contains a delegation clause, that delegation clause may be given effect only where the contract has been formed in the first instance.").[4]

---

[4] Nor does any purported incorporation of arbitral rules change the fact that only the Court can determine the threshold issue of whether an agreement to arbitrate was formed. *See Belyea v. GreenSky, Inc.,* 2020 WL 3618959, at *4 (N.D. Cal. July 2, 2020) (rejecting defendant's argument that incorporation of arbitral rules delegates arbitrability where there is a challenge to the existence of an enforceable agreement to arbitrate in the first place). This is particularly true where, as here,

Further, the issue of enforceability cannot be delegated to an arbitrator because the delegation clause itself is unconscionable and unenforceable. Indeed, when Temu's delegation clause is taken together with its Batching Provision, the threshold adjudication by the arbitrator of arbitrability will only serve to further delay resolution. *See e.g., Pandolfi v. AviaGames, Inc.,* 2024 WL 3558853 at *4-8 (N.D. Cal. July 26, 2024) (invalidating delegation clause as unconscionable when coupled with similar provision because the "prospect of delay – on the limited gateway issue alone – likely has a chilling effect on players, deterring them from vindicating their rights" and "actual delay (indeed, significant delay)" was established by the number of claims already pending). Plaintiff argues Temu's delegation clause is unconscionable for the same reasons that its Arbitration Agreement is unconscionable and unenforceable, as discussed *infra*.

Thus, regardless of what Temu's delegation clause purportedly states, it is well-established in this Circuit that the question of whether an enforceable agreement to arbitrate exists in the first place cannot be delegated and must be decided by this Court. And further, any enforceability challenge must be decided by this Court because Temu's delegation clause is unconscionable and unenforceable.

**C.    No Agreement to Arbitrate Was Formed Between the Parties Because Temu Failed to Meet its Burden to Prove that Plaintiff Was on Notice of Temu's Terms and Assented to be Bound**

Plaintiff's claims cannot be compelled to arbitration because no binding agreement to arbitrate exists between the parties. Indeed, there is no evidence that Plaintiff was aware of Temu's Terms and corresponding Arbitration Agreement, and Plaintiff attests he never saw them. *See* Silva Decl., ¶¶ 6-7. The evidence Temu submits through the Trinh Declaration in wholly insufficient to satisfy its burden to prove that Plaintiff assented to arbitration because it has not demonstrated that the proffered Registration Prompts were the same screens that Plaintiff viewed when he made his purchase, and

---

Plaintiff is not a sophisticated party, but rather, a "common customer." *See e.g., MacClelland,* 609 F. Supp. 3d at 1031-32 ("Where at least one party is unsophisticated, courts in this district and elsewhere have routinely found that the incorporation of the AAA rules is insufficient to establish a clear and unmistakable agreement to arbitrate arbitrability") (collecting cases).

thus, lacks authenticity and is inadmissible. But even if the Trinh Declaration didn't face detrimental evidentiary concerns, the insufficient form of notice Temu chose to utilize on its website forecloses a finding of inquiry notice, either. And where Plaintiff had no actual, nor inquiry notice of arbitration, he could not have assented to terms he never reasonably became aware of. Accordingly, Plaintiff's claims can only be litigated in this Court.

1.      **The Trinh Declaration is Insufficient to Prove Plaintiffs Agreed to Temu's Terms and Arbitration Agreement**

The Trinh Declaration fails to satisfy Defendant's burden. Trinh merely states that "Temu's records show that on February 21, 2024, Plaintiff entered his email address, clicked the 'Continue' button, and then created a password for his Temu account and clicked the 'Register' button immediately above the Terms link." Trinh Decl., ¶ 11. But Trinh does not explicitly state that the incorporated Registration Prompts are the same versions that Plaintiff would have allegedly encountered in February 2024 when he registered his account with Temu. *See generally,* Pltf's Objs. to Evid. This is problematic, as Defendant cannot meet its burden of proof without this necessary foundation. *See e.g., Lopez v. Dave Inc.,* No. 22-cv-04160-VC, 2022 WL 17089824, at *1 (N.D. Cal. Nov. 21, 2022), *aff'd* No. 22-16915, 2023 WL 8594393 (9th Cir. Dec. 12, 2023) (declaration in support of motion to compel arbitration was "deficient" where it similarly failed to attest that the "attached sign-up page was the version that would have appeared in March 2019, when Lopez joined Dave"); *Snow v. Eventbrite, Inc.,* No. 3:20-cv-3698-WHO, 2020 WL 6135990 at *8 (N.D. Cal. Oct. 19, 2020) (denying arbitration where defendant failed to produce evidence demonstrating what its webpages would have looked like at the time plaintiffs interacted with the platform; "[t]he problem remains, however, that these images are from present day and Eventbrite has not shown what the pages would have looked like when Snow saw them"); *In re Axos Bank Litig.,* No. 23-cv-2266-RSH-SBC (S.D. Cal. July 11, 2024) (ECF No. 26) (denying motion to compel arbitration where deficient declaration failed to satisfy defendant's burden of proof).

2.      **Temu's Registration Prompts Fail to Provide Sufficient Notice of the Arbitration Agreement**

OPPOSITION TO MOTION TO COMPEL ARBITRATION

Even assuming the Trinh Declaration was admissible, Temu nevertheless failed to provide sufficient notice of its Terms. In the Ninth Circuit, a finding of assent requires that the offeree had either actual, or inquiry notice of the terms to be bound. *Berman,* 30 F.4th at 856. California's contract formation principles "apply with equal force to contracts formed online[,]" such as the agreement employed by Temu. *Id.* at 855-56. Regardless of the various categories of web-based contracts—from clickwrap to browsewrap, and even some combination of the two such, described as a "sign in wrap" like Temu's—the touchstone rules for analyzing contract formation over the Internet are uniform:

> Unless the website operator can show that a consumer had actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Id.* at 856. In assessing the conspicuousness of terms, the California Court of Appeals in *Sellers* set forth "a list of criteria that federal courts tend to rely upon" which include, but are not limited to "the size of the text," the "proximity [of the text] to any box or button the user must click to continue use of the website," the "obviousness of any associated hyperlink," and whether the screen has "clutter or otherwise obscure[s] the textual notice." *Chabolla,* 2023 WL 4544598, at *4 (citing *Sellers,* 73 Cal. App. 5th at 473).

Here, Plaintiff lacked both actual and inquiry notice of Temu's Terms. Temu makes no effort to show that Plaintiff had actual notice of its Terms and Arbitration Agreement therein. Instead, Temu argues that Plaintiff was put on inquiry notice when he created his Temu account through Temu's registration process. Not so. Temu never requires users to affirmatively click the hyperlinked Terms, nor click a box to indicate that they reviewed them. Moreover, the Terms hyperlink and preceding disclaimer are in such a miniscule text size that they are nearly unnoticeable to any average user, extremely difficult to read, and are not sufficiently obvious or set apart from the rest of the text on the screen. The non-distinguishing text is particularly problematic given the prominence of the large, orange "Continue" and "Register" buttons located *above* the disclosures and hyperlinks, which are the obvious focal points on both Registration Prompts and distract from the remainder of the text on the screen. Any reasonable consumer presented with these screens would easily overlook the

OPPOSITION TO MOTION TO COMPEL ARBITRATION

1    inconspicuous hyperlinked Terms, especially because they would have no reason to read the rest of

2    the screen before clicking the requisite buttons to proceed.

3        The *Berman* decision is analogous. *See Berman,* 30 F.4th 849 (analyzing an online contract

4    under both California and New York law). In *Berman,* the Ninth Circuit affirmed the court's order

5    denying defendant's motion to compel arbitration on the grounds that the terms to which plaintiffs

6    would be bound were not "reasonably conspicuous" on defendant's website:

> The text disclosing the existence of the terms and conditions on the websites is the
> antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the
> font used in the surrounding website elements, and indeed in a font that is barely
> legible to the naked eye. The comparatively larger font used in all of the surrounding
> text naturally directs the user's attention everywhere else. And the textual notice is
> further deemphasized by the overall design of the webpage, in which other visual
> elements draw the user's attention away from the barely readable critical text. Far from
> meeting the requirement that a webpage must take steps "to capture the user's attention
> and secure her assent," the design and content of these webpages draw the user's
> attention away from the most important part of the page.

13    *Id.* at 856-57 (citations omitted). The relevant portion of a screenshot from one of the sign-in screens

14    at issue in *Berman* is incorporated below:



19    *See id.,* at Appendix B.

20        Similarly, here, the Temu's Terms are printed in a tiny font that is substantially smaller than

21    the rest of the text on the screens, and the textual notice is deemphasized in comparison to the overall

22    design of the screen, such that a user's attention is likely to be drawn elsewhere. The hyperlinks are

23    further problematic because, although though they are in blue font, they are not in all caps. *See id.* at

24    857 (cautioning that hyperlinks should "include the use of a contrasting font color (typically blue)

25    ***and the use of all capital letters***, ***both*** of which can alert a user that the particular text differs from

26    other plain text")(emphasis added). In fact, Temu's Registration Prompts are even more problematic

27    than the webpage in *Berman* and are similar to the sign-in screen the Ninth Circuit held to be

28    unenforceable in *Lopez:*

1
2
3
4
5
6
7
8
9
10
11
12





Dkt. No. 27-2.

13    *Lopez,* 2022 WL 17089824 at *2, Appendix. Like in *Lopez,* Temu's Terms are located *below* the

14    relevant buttons, meaning that a user could enter their information to populate the relevant fields and

15    then continue on without ever viewing the remainder of the screen. *See id.* Further, the disclosure in

16    *Berman* explicitly informs that the terms included "mandatory arbitration," whereas Temu's

17    disclosure vaguely references its "Terms of Use" but says nothing about binding arbitration. *Id.*

18          That Temu's hyperlink is denoted in blue text is insufficient to salvage the overwhelming

19    inconspicuousness created by its tiny font size and placement that otherwise causes the Terms to

20    blend into the design of the Registration Prompts. In fact, many courts have refused to bind consumers

21    to terms even where they were hyperlinked in a contrasting color. For example, in *Farmer v. BarkBox,*

22    *Inc.,* 2023 WL 8522984, at *2 (C.D. Cal. Oct. 6, 2023), the court held that a "modified clickwrap"

23    that presented its terms in blue, underlined hyperlink located immediately above the mechanism for

24    assent did "not satisfy the objective reasonableness standard" in the Ninth Circuit where it was in

25    similar miniscule font:

26
27
28

13

By clicking "Buy now" you are committing to the length of your
BarkBox plan and agree to our Terms & Privacy Policy

BUY NOW

*Id.* As another example, Judge Yvonne Gonzales of this District Court held similarly in refusing to compel arbitration based on a sign-in wrap agreement presented to plaintiff when signing up for a ClassPass membership. *See Chabolla,* 2023 WL 4544598. Although "the phrases 'Terms of Use' and 'Privacy Policy' appeared in blue font unlike the remainder of the textual notice[,]" such that it "could alert a prospective ClassPass member" to those links, "this alone does not make the text notice of the Terms conspicuous in light of the other deficits identified" such as the tiny font size. *Id.* at *4 n.3.[5] Accordingly, Temu's Registration Prompts similarly fail to meet the Ninth Circuit's reasonably conspicuous standard to bind Plaintiff and other consumers to arbitration.

Temu's Motion relies almost exclusively on two Ninth Circuit decisions, which it argues "dictate the outcome" of its Motion. Mot. at 6 (citing *Keebaugh v. Warner Bros. Entertainment Inc.,* 100 F. 4th 1005 (9th Cir. 2024) and *Oberstein v. Live Nation Entertainment, Inc.,* 60 F. 4th 505 (9th Cir. 2023)). However, both decisions are factually distinguishable. In *Keebaugh,* the court found the defendant's sign-in wrap presented its terms in a "sufficiently conspicuous" manner where the Terms of Service were isolated in its own box, "emphasized through white borders outlining the hyperlinks."

_____

[5] Many courts are in accord. *See also Seneca v. Homeaglow, Inc.,* 2024 WL 750029, at *4 (C.D. Cal. Feb. 7, 2024) (notice insufficient even where "the hyperlinks to the agreement are blue and underlined, as standard hyperlinks are formatted, which would signal to most consumers that there is further text to view on a related webpage" and placed "just above the button consumers must click to finalize" because the text was "no bigger" than the remaining text and "does not call any particular attention to these important conditions"); *Long,* 245 Cal. App. 4th at 865 (finding capitalized and underlined hyperlinks to terms of use in light green font situated amongst other text in comparative font size and style on the checkout flow page were "simply too inconspicuous to meet [the reasonable notice] standard"); *Theodore v. Uber Technologies, Inc.,* 442 F. Supp. 3d 433, 440-42 (D. Mass. 2020) (although hyperlink to company's terms appeared in blue text against white background, it was not conspicuous enough to place the consumer on inquiry notice); *Applebaum v. Lyft, Inc.,* 263 F. Supp. 3d 454, 458, 466-67 (S.D.N.Y. 2017) (holding small-print hyperlink in blue font against white background was insufficient to constitute reasonable notice).

1    100 F. 4th at 1010-11; 1021. And in the relevant page from *Oberstein* submitted by Temu, (Mot. at

2    11), the disclosure and hyperlinked terms were located immediately above the relevant button (not

3    underneath it, like Temu's) such that a user was far more likely to view the terms before continuing

4    past the webpage. Thus, the conspicuous presentation of terms in these decisions do not save Temu.

5          **D.      Temu's Arbitration Agreement is Unconscionable and Unenforceable**

6          Next, Temu's Motion must be denied for an independent reason: Temu's Arbitration

7    Agreement is unconscionable and unenforceable. California law invalidates contractual provisions as

8    unenforceable where they are both procedurally and substantively unconscionable. *Kilgore v.*

9    *KeyBank, Nat'l Ass'n,* 718 F.3d 1052, 1058 (9th Cir. 2013) (citing *Armendariz v. Found. Health*

10   *Psychare Servs., Inc.*, 24 Cal. 4th 83, 89 (2000)). However, the two types of unconscionability need

11   not be of the same degree, as they are evaluated on a sliding scale. *Chavarria v. Ralphs Grocery Co.,*

12   733 F.3d 916, 922 (9th Cir. 2013). The more substantively oppressive the contract terms, the less

13   evidence of procedural unconscionability is required to invalidate the provision, and vice versa. *See*

14   *id.* Temu's Arbitration Agreement is adhesive in nature and contains harsh, one-sided, and unfair

15   provisions to such a degree that it is enough to invalidate its Arbitration Agreement entirely.

16              **1.      Temu's Arbitration Agreement is Procedurally Unconscionable**

17         The unconscionability analysis begins with procedural unconscionability, which "concerns

18   the manner in which the contract was negotiated and the respective circumstances of the parties at

19   that time, focusing on the level of oppression and surprise involved in the agreement." *Chavarria,*

20   733 F.3d at 922. "Oppression addresses the weaker party's absence of choice and unequal bargaining

21   power that results in 'no real negotiation[,]'" whereas "[s]urprise involves the extent to which the

22   contract clearly discloses its terms as well as the reasonable expectations of the weaker party." *Id.*

23   (citations omitted).

24         The Ninth Circuit, applying California law, has held that "[a] contract is procedurally

25   unconscionable if it is a contract of adhesion, *i.e.*, a standardized contract, drafted by the party of

26   superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to

27   the contract or reject it." *Ting v. AT & T*, 319 F.3d 1126, 1148 (9th Cir. 2003). Temu's Terms is an

28   adhesive contract because it is a standardized agreement imposed upon a party of lesser bargaining

power, on a take-it-or-leave-it basis, with no real opportunity to negotiate the terms. *See e.g., MacClelland,* 609 F. Supp. 3d at 1033-34 (consumer contract for wireless services). This alone is enough to establish procedural unconscionability. *See Newton v. American Debt Services, Inc.*, 854 F. Supp. 2d 712, 723 (N.D. Cal. 2012), *aff'd,* 549 App'x 692 (9th Cir. 2013) ("An adhesion contract fulfills the requirement of procedural unconscionability"). The element of unfair surprise also exists given Temu's insufficient form of notifying consumers of its binding terms, *see supra.* Thus, procedural unconscionability is met.

### 2.    Temu's Arbitration Agreement is Substantively Unconscionable

Substantive unconscionability "examines the fairness of a contract's terms," particularly whether the terms are "unreasonably favorable to the more powerful party." *Swain v. LaserAway Medical Group, Inc.*, 57 Cal. App. 5th 59, 70-71 (2020) (citing *OTO, LLC v. Kho,* 8 Cal. 5th 111, 130 (2019) ("Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided") (citations omitted). The "paramount" consideration in assessing substantive unconscionability is whether the arbitration provision is mutual. *Pokorny v. Quixtar, Inc.,* 601 F.3d 987, 997 (9th Cir. 2010) (citing *Abramson v. Juniper Networks, Inc.,* 115 Cal. App. 4th 638, 664 (2004)). Temu's Arbitration Agreement is infused with substantively unconscionable provisions that collectively make arbitration the inferior forum for consumers.

Most importantly, Temu has subjected Plaintiff's claims to a so-called "Batch Arbitration" procedure—a process akin to mass arbitration procedures that have been held substantively unconscionable by courts in this District for the chilling effect they have on consumers seeking to vindicate their rights in an expedient manner. *See e.g., MacClelland,* 609 F. Supp. 3d at 1024; *Pandolfi,* 2024 WL 3558853 at *7-8. In *MacClelland,* the mass arbitration procedure was triggered where coordinated counsel filed 25 or more claims against Verizon and set up a bellwether system to adjudicate 10 cases at a time. *MacClelland,* 609 F. Supp. 3d at 1024. Because the procedure required 10 cases to be resolved before the next 10 cases could proceed, the court found the procedure was substantively unconscionable because it would inordinately delay resolution and deter potential litigants from enforcing their rights:

1

2
Requiring the consumers who retain counsel willing to represent them in cases such as this to wait months, more likely years before they can even submit a demand for arbitration is unreasonably favorable to Verizon. Delaying the ability of one to vindicate a legal claim by years, possibly 156 years, conflicts with one of the basic principles of our legal system—justice delayed is justice denied. Terms that contravene the public interest or public policy are substantively unconscionable.

3

4

5  *Id.* at 1042 (internal citations, quotation marks, and alterations omitted.)

6      Relying on *MacClelland,* the court in *Pandolfi* just a few weeks ago held that a similar mass

7  arbitration provision was substantively unconscionable and unenforceable. 2024 WL 3558853 at *10.

8  In *Pandolfi,* Judge Edward M. Chen found the arbitration provision which also utilized a protracted

9  bellwether process if 25 or more similar claims are asserted by "the same or coordinated counsel or

10  are otherwise coordinated" was substantively unconscionable because "it would result in delayed

11  resolution" for both the "limited issue of arbitrability" as well as resolution of the ultimate issue of

12  liability. *Id.* at *6. The court elaborated:

13

14

15

16

17

18

19

20
Although Plaintiffs' counsel and the Kind firm do not, as a facial matter, appear to have coordinated efforts, the bellwether provision is triggered not only by twenty-five or more similar claims being brought by the same or coordinated counsel but also by the cases otherwise being coordinated. At the hearing, the Avia Defendants conceded that coordination could be sought by any party or could be effectuated sua sponte by the arbitrator. The Avia Defendants also conceded that the only standard for coordination seemed to be that the claims at issue be similar. Therefore, it is more than likely that, if the claims being pursued by Plaintiffs and others represented by Plaintiffs' counsel were to be arbitrated, they would be coordinated with the claims being pursued by the Kind firm's clients. The instant case thus becomes largely indistinguishable from *MacClelland:*because of the bellwether provision which allows only twenty cases at a time to be arbitrated, claimants—numbering in the thousands—will have to wait months, more likely years before they can even submit a demand for arbitration, let alone have the issue of arbitrability decided.

21  *Id.* (internal citations omitted). The court further noted "another troubling aspect" was that the only

22  way "to avoid the bellwether provision" would require consumers "to find different counsel, which

23  affects the right to counsel of their choice or indeed, the ability to find any counsel at all: whether the

24  individual claims are small (as consumer claims often are), it may be difficult to find any attorney

25  who represents only a single or small number of similarly situated clients." *Id.* at *9.

26      Temu's one-sided Batching Provision suffers similar deficiencies rendering it substantively

27  unconscionable. Indeed, by its plain terms, the batching arbitration procedures lack mutuality because

28  they do not apply to claims brought by Temu, but only to claims brought against Temu, like those

17

OPPOSITION TO MOTION TO COMPEL ARBITRATION

1   asserted by Plaintiff here and the thousands of other consumers who have already initiated arbitration

2   to date. *See* Ex. A at § 19.9. Temu's Batching Provision is invoked in this case because already

3   thousands of similar claims have been filed against Temu in the AAA. Gold Decl., ¶ 4. Thus, if this

4   Court were to send Plaintiff's case to arbitration, it is likely this case would get batched into these

5   other cases and would suffer undue delay.

6          Administration of this procedure is subject to additional delay in that if any party contests the

7   applicability of this Batching Provision, Temu requires that this question be resolved separately by

8   an Administrative Arbitrator. Ex. A at § 19.9. The effect of the Batching Provision then, is that many

9   Temu customers "will not be able to file a claim in arbitration for years and possibly ever" which

10  would "operate to effectively thwart arbitration and vindication of rights altogether." *MacClelland,*

11  609 F. Supp. 3d at 1046.

12         Additionally, and even worse than the concern articulated in *Pandolfi,* the Batching Provision

13  here is triggered where claims of a "substantially similar nature" are filed against Temu "by or with

14  the assistance of the *same law firm, group of law firms, or organizations*." *Id.* This clause is extremely

15  broad in application such that one cannot even imagine what counsel Plaintiff would need to retain in

16  order to fall outside of the Provision's ambit. This component also illustrates the lack of mutuality

17  inherent in the Batching Provision because Temu "is able to enjoy all the advantages that come from

18  being a 'repeat player,' while law firms that represent twenty-five or more of [Temu]'s customers

19  may be forced to sideline any clients which would exceed the numeric cap." *Id.* at 1043.[6]

20         Further compounding the unconscionability is the fact that the batching procedure could

21  subject Plaintiff to attending arbitration in a distant, inconvenient forum. *See id.* at § 19.5 ("Unless

22  you and we otherwise agree, or the Batch Arbitration process discussed in Section 19.9 is triggered,

23  the arbitration will be conducted in the county where you reside.").

24

25  _____

26  [6] Indeed, the provision seemingly impermissibly restricts an attorney's right to practice law in
    California, by prejudicing those attorneys who have chosen to retain more than 25 clients with the
27  same claims. A contractual provision which attempts to limit an attorney's ability to represent clients
    is unethical in California. *See* Cal. Rules of Professional Conduct, rule 5.6.
28

OPPOSITION TO MOTION TO COMPEL ARBITRATION

1      At bottom, although arbitration is supposed to be an expedient mechanism for dispute

2 resolution, Temu obstructs this objective by foisting its one-sided Batching Provision upon Plaintiff

3 and other consumers. Because the Batching Provision invites not just the prospect of, but has already

4 caused substantial, undue delay, this provision is substantively unconscionable and unenforceable.[7]

5      *Second*, and further compounding the delay, is that Temu's Arbitration Agreement contains

6 an onerous pre-arbitration requirement that compels each individual consumer to personally attend a

7 mandatory "Informal Dispute Resolution Conference" before they can initiate arbitration. Ex. A at §

8 19.2. In addition to being unreasonably burdensome by requiring Plaintiff—and not just his counsel—

9 to personally attend, this pre-arbitration requirement also creates further undue delay of resolution

10 when coupled with the Batching Provision: Temu further requires that "*separate conference[s] must

11 be held each time either party initiates a Dispute*, *even if the same law firm or group of law firms

12 represents users in similar cases*, unless all parties agree; multiple individuals initiating a Dispute

13 cannot participate in the same Informal Dispute Resolution Conference unless all parties agree." Ex.

14 A at § 19.2. Thus, this provision similarly impedes swift resolution by hosting unlimited individual

15 conferences, even if those plaintiffs are subject to batching.

16      **3.  The Arbitration Agreement Cannot Be Saved Through Severance**

17      When faced with an unconscionable arbitration provision, courts have the discretion to either

18 sever it or refuse to enforce to provision all together. *See Armendariz*, 24 Cal.4th at 122; Cal Civ.

19 Code 1670.5(a). In making this determination, "[t]he overarching inquiry is whether the interests of

20 justice would be furthered by severance." *Id.* at 124. "If the central purpose of the contract is tainted

21 with illegality, then the contract as a whole cannot be enforced." *Id.* And where an arbitration clause

22 is "permeated" with unconscionability, severability is a nullity. *Id.* Indeed, even the existence of a

23 severability clause "does not change the fact that where an agreement is permeated by

24 unconscionability, a court will not sever the unlawful provisions." *MacClelland,* 609 F. Supp. 3d at

---

[7]    The established unconscionability of Temu's Batching Provision further requires that the Court invalidate Temu's entire Arbitration Agreement pursuant to its poison pill provision discussed *infra.*

1  1045 (invalidating entire arbitration agreement notwithstanding severability clause); *see also Jackson*

2  *v. S.A.W. Entertainment Ltd.,* 629 F. Supp. 2d 1018, 1030 (N.D. Cal. 2009) ("the fact that a severance

3  can mechanically and grammatically be accomplished is not dispositive").

4         Here, the interests of justice will not be furthered by severance of Temu's unconscionable

5  provisions because the Arbitration Agreement is permeated by unconscionability. At the outset,

6  Temu's one-sided Batching Provision legally cannot be severed because Defendant affirmatively

7  foreclosed this possibility by carving out this provision from the severability clause: "if [the Batch

8  Arbitration provision] is found under the law to be invalid or unenforceable to any extent, then you

9  agree that the *entire* Arbitration Agreement shall be of no force and effect." Ex. A at § 19.11

10 (emphasis added); *see also id.* at § 18.9 (invoking severability clause "[e]xcept as provided in Section

11 19.11"). As such, this poison pill *requires* the Court to invalidate Temu's *entire* Arbitration

12 Agreement accordingly. Notwithstanding the poison pill, severance would nevertheless be

13 inappropriate because "[s]everance does not cure the problematic chilling effect of the

14 unconscionable [Batching Provision]." *Pandolfi,* 2024 WL 3558853 at *8. As the *Pandolfi*

15 court explained in refusing defendant's request to sever the offending bellwether provision, defendants "are

16 not entitled to rely on severance as a fix when they profited from the inclusion of the bellwether

17 provision in the first place, *i.e.,* because it may have a chilling effect that deterred players from ever

18 pursuing their rights in the arbitral forum available to them." *Id.*

19        Further, when considering all the offending provisions combined, severance is not justified

20 because each provision "indicates a systematic effort to impose arbitration not simply as an alternative

21 to litigation, but as an inferior forum." *Yeomans v. World Fin. Grp. Ins. Agency, Inc.,* 485 F. Supp.

22 3d 1168, 1189-90 (N.D. Cal. 2020) (citing *Armendariz,* 24 Cal. 4th at 124-25). Where, as here, "[t]he

23 arbitral forum therefore has been structurally and systematically designed to be an inferior forum,"

24 the Court should "not sever to save the agreement to arbitrate." *Pandolfi,* 2024 WL 3558853 at *10.

25 To do otherwise "may indirectly reward systemic unconscionability." *MacClelland,* 609 F. Supp. 3d

26 at 1046. Thus, this Court should refuse to sever the unconscionable provisions, invoke the poison pill,

27 and find the entire Arbitration Agreement unenforceable.

28

**E.**    **Defendant's Class Action Waiver is Unenforceable Once Divorced from its Arbitration Agreement**

As a final matter, Defendant argues that Plaintiff is not entitled to seek class-wide relief, "even if the class action waiver were not part of an agreement to arbitrate." Mot. at 14. To the contrary, as this Court has recognized, class action waivers—once divorced from an arbitration provision, contained in an adhesive consumer contract, and intentionally imposed by the party with superior bargaining power to unfairly limit its liability by thwarting consumers' small-dollar individual claims—are unconscionable and unenforceable under California law. *See Suski v. Marden-Kane, Inc.,* 2022 WL 3974259, at *4-5 (N.D. Cal. Aug. 31, 2022) (Kim, J.) (finding class action waiver unconscionable under *Discover Bank v. Super. Ct.,* 36 Cal. 4th 148 (Cal. 2005) because where "a class action waiver is not coupled with an arbitration provision, California law on unconscionability applies"); *see also Shroyer v. New Cingular Wireless Servs., Inc.,* 498 F.3d 976, 983 (9th Cir. 2007) (summarizing a three-part inquiry to determine whether a class action waiver is unconscionable under California law).

As demonstrated above, because no valid agreement to arbitrate was ever formed between the parties, and because Plaintiff has demonstrated that Temu's Arbitration Agreement is unconscionable and unenforceable pursuant to the poison pill provision, this Court may also find that the standalone class action waiver is unenforceable, as well.

**IV.**    **CONCLUSION**

Accordingly, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety and allow Plaintiff's claims to proceed in court.

Dated: August 14, 2024                    Respectfully submitted,

**KALIELGOLD PLLC**

By:*/s/ Sophia G. Gold*
   Sophia Goren Gold (SBN 307971)
   *sgold@kalielgold.com*
   490 43rd Street, No. 122
   Oakland, CA 94609
   Tel: (202) 350-4783

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey D. Kaliel (SBN 238293)
*jkaliel@kalielpllc.com*
1100 15th Street NW, 4th Floor
Washington, D.C.  20005
Tel: (202) 350-4783

**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330990)
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsberglaw.com

*Attorneys for Plaintiff and the Proposed Class*

22