1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Sallie Kim, Magistrate Judge

4

5   SILVA,                          )  No. C 24-02890-SK
                                    )
6            Plaintiff,             )
                                    )
7   vs.                             )
                                    )
8   WHALECO, INC.,                  )
                                    )
9            Defendant.             )
    _____)

10
                                    San Francisco, California
11                                  Monday, October 7, 2024

12
     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13             RECORDING 9:31 - 10:02 = 31 MINUTES

14  APPEARANCES:

15  For Plaintiff:
                              KalielGold, PLLC
16                            40- 43rd Street, Suite 122
                              Oakland, California 94609
17                        BY: SOPHIA G. GOLD, ESQ.

18  For Defendant:
                              Latham & Watkins, LLP
19                            355 South Grand Avenue
                              Suite 100
20                            Los Angeles, California 90071
                          BY: STEVEN N. FELDMAN, ESQ.
21

22  Transcribed by:           Echo Reporting, Inc.
                              Contracted Court Reporter/
23                            Transcriber
                              echoreporting@yahoo.com
24

25

2

1  <u>Monday, October 7, 2024</u>                    <u>9:31 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                        --oOo--

4        THE CLERK:  Calling Civil Case Number 24-2890,

5  Silva v. WhaleCo.

6      Please state your appearances for the record, starting

7  with the Plaintiff.

8        MS. GOLD (via Zoom):  Good morning, your Honor.

9  This is Sophia Gold on behalf of the Plaintiff.

10        THE COURT:  Good morning.

11        MR. FELDMAN (via Zoom):  Good morning, your Honor.

12  Steven Feldman of Latham and Watkins, on behalf of

13  Defendant.

14        THE COURT:  Good morning.  So, Mr. Feldman, this

15  is your motion.  So, I'll let you start.  I might have some

16  questions while you're talking.  So, I'll just interrupt you

17  if I need to.

18        MR. FELDMAN:  Thank you, your Honor.  With your

19  permission, may I put up a brief PowerPoint to assist with

20  the discussion?

21        THE COURT:  Sure.

22        MR. FELDMAN:  Thank you.  I'll do that right now

23  or at least I will attempt my best to do so.  Can that be

24  seen on the screen, your Honor?

25        THE COURT:  Yes.

3

1          MR. FELDMAN:  Thank you.  Today's matter raises a

2  straightforward motion to compel.  Temu prominently

3  displayed the terms of use on its website as part of the

4  sign-in flow that users go through to register an account.

5  Under Ninth Circuit precedent, including recent precedent in

6  Keebaugh and Oberstein, both of which are in the past 18

7  months, the Ninth Circuit has made clear that a sign-in wrap

8  agreement of the type we have here is enforceable and must

9  be enforced by district courts when there's a reasonably

10  conspicuous notice of the terms which is a fact-intensive

11  inquiry and the user takes some sort of action such as

12  clicking a button to manifest assent.  We have both here.

13      The Plaintiff here -- and there really is no dispute --

14  Mr. Silva, consented to two registration prompts on the

15  website.  The first one you see on the left where you have

16  the Continue button, and below that you see "By continuing

17  to agree to our terms of use and privacy policy, by

18  continuing, you agree to them."  He then clicked continue.

19  We also know that not only that, after he entered in his

20  email address, he then received a second registration prompt

21  which you see, your Honor, on the right-hand side where,

22  again, directly below the Register button, it says "By

23  clicking Register, you agree to our terms of use and privacy

24  policy," and we know that he clicked that as well.

25          THE COURT:  Can I stop you just one minute?

4

1          MR. FELDMAN:  Yes, of course.

2          THE COURT:  Ms. Gold, so, does your client deny

3   that this is the situation?  He just says that he can't

4   remember?

5          MS. GOLD:  That's correct, your Honor.  He does

6   not recall one way or the other, but we were challenging

7   specifically in the first declaration the -- the evidence

8   that they put forward to prove that this was, in fact, the

9   screenshot that he was shown.  And, of course, it's

10  particularly important in the context of these online

11  interfaces because they are constantly changing.  We know

12  that from the Defendants, and we know that from other cases

13  that have proceeded against Temu that there have been

14  various versions of the screen.

15      So, our point in submitting that declaration was not so

16  much to say that we have different evidence but that the

17  evidence that was put forward to prove that these were the

18  screens was deficient.

19          THE COURT:  But you have no evidence, though, to

20  -- to counter this, as I -- as I understand it?

21          MS. GOLD:  Correct.  He has no recollection one

22  way or the other.

23          THE COURT:  Okay.  All right.  Okay.  Sorry, Mr.

24  Feldman.  I interrupted you.  Go ahead.

25          MR. FELDMAN:  Not a problem at all, your Honor.

5

1 So, yeah, I don't think there's any dispute at this point

2 about the version that Mr. Silva saw.  And, just to be

3 clear, the cases where someone has said something along the

4 lines of what I heard Ms. Gold say, which is, you know, I

5 don't recall what I saw, they've made it clear that that is

6 not sufficient to create a disputed fact about the creation

7 of an arbitration agreement.  The Whalen v. Facebook case

8 cited and others have said if a party could get out of a

9 contract by arguing he didn't recall making it, contracts

10 would essentially be meaningless.

11     So, we know that he clicked both of these buttons and

12 that this was the registration that he saw.  Now, let's look

13 at what the Ninth Circuit has said.  These are the two --

14 I'm just going to look at the two most recent cases,

15 precedential Panel decision from earlier this year.  The

16 Ninth Circuit in the Keebaugh case reversed and remanded a

17 district court that had not compelled arbitration and

18 ordered arbitration be compelled in this case where the user

19 saw the registration prompt you see on the lefthand side.

20 It's a dark screen.  Below that bright blue play button,

21 this was to sign up for a Game of Thrones Conquest game.

22 You can see it says, "By tapping Play, I agree to the terms

23 of service."  The Ninth Circuit found there that it was in

24 contrasting font.  It wasn't hidden.  It wasn't below, and

25 that was enough.  And if you see on the right-hand side what

6

1  Mr. Silva undisputably clicked here, I mean, it's far more
2  clear and conspicuous.  You've got, you know, an all white
3  page.  You can see it in the blue bolded font, Terms of Use
4  and Privacy Policy, quite clearly.  It's significantly more
5  than what the Ninth Circuit had in <u>Keebaugh</u> where the
6  reversed and remanded and compelled arbitration.

7       Likewise, your Honor, if you look at the <u>Oberstein</u>
8  decision, an other precedential Panel decision of the Ninth
9  Circuit just last year, they compelled arbitration with the
10 registration prompt you see on the left, and the
11 registration prompt on the left does look somewhat like what
12 we have in Temu, but I'd argue even -- Temu's is even more
13 clear and that the font is clearer.  The term that -- we
14 have underlining, which we don't have in the other one.  We
15 have just a bit of a more clear record.  And in both of
16 these cases, the Ninth Circuit compelled arbitration and
17 found that this is enough that this is reasonably
18 conspicuous to constitute constructive assent to the terms
19 and that clicking the Next button or the Play button, in our
20 case, the register button, was absolutely sufficient to
21 manifest consent.

22      So, what do we have here?  We have contrasting font
23 color.  We have a readily available and apparent hyperlink.
24 We have an uncluttered interface and proximate notice, and
25 we have the user, Mr. Silva, unequivocally clicking a

7

1 button.

2      Now, the case that Plaintiffs talk about, which I found

3 a little odd because I think it -- it varies squarely, is a

4 case in Temu's favor here, is the Berman case.  This is an

5 older Ninth Circuit decision, not old, just a couple of

6 years old but before the Keebaugh and Oberstein case, and

7 the Ninth Circuit there looked at this registration prompt

8 you see on the left and said, You know, this isn't enough.

9 And then why isn't this enough?  Well, look at what we have

10 on the bottom there.  We've got, as the Ninth Circuit said,

11 tiny gray font, barely legible to the naked eye, de-

12 emphasized by the overall design, considerably smaller than

13 everything we saw else, and what they said the antitheses of

14 conspicuous.  And I'd argue, your Honor, that I think it's

15 pretty clear from just the visual record and just looking at

16 these things that Temu's registration prompt is nowhere near

17 that.  In fact, it's on the furthest end of what I'd call

18 the spectrum of conspicuous.  And, so, if we look at the

19 Ninth Circuit case law here, whether they said, Well, not

20 conspicuous in Berman -- that's what we just saw right over

21 there, all gray, de-emphasized, tiny font.  You can't see

22 it.  What is enough?  Well, Keebaugh is enough even though

23 it kind of, honestly, to me doesn't look that clear, but

24 they said that's enough.  It's in contrasting color.  It's

25 right there.  You could see it.  And they said in Oberstein,

8

1  well, that's enough, and that's a little bit more

2  conspicuous.  And then you have what we have here, which is

3  really kind of a gold plated standard of being quite clear,

4  quite conspicuous, bold, blue, underlined.  And, of course,

5  Mr. Silva saw the notice two times.  So, he saw it the first

6  time when he had to enter in his email and click Continue,

7  and then he saw it again on the Registration sign.

8       So, your Honor --

9            THE COURT:  Let me stop you for a minute, Mr.

10 Feldman.

11           MR. FELDMAN:  Yes.

12           THE COURT:  Ms. Gold, let me ask you this.

13 Assuming that this is what Mr. Silva actually saw, do you

14 agree that this is conspicuous enough under the Ninth

15 Circuit standard to satisfy a motion to compel?

16           MS. GOLD:  No, your Honor.  And we do make that

17 argument in that papers.

18           THE COURT:  Why?  Why?  What's the difference

19 between Keebaugh and Oberstein and Temu?  And this is

20 assuming that this is what your client saw.

21           MS. GOLD:  Sure, your Honor  Well, obviously, we

22 know from the Ninth Circuit that this analysis is always

23 going to be factually specific.  It is always going to be

24 incredibly tailored to the screen that's at issue.  And here

25 the screens are designed to draw your attention, your --

9

1  your eye to the bright orange button that's Continue or

2  that's Register, and it's only --

3          THE COURT:  How is that different from <u>Keebaugh</u>?

4  Because Play is in bright blue, and I agree it's actually

5  pretty hard to see Terms of Service on the lower right-hand

6  side, and it's not underlined, and it's not in a different

7  font, and it's against that dark black background.  It's

8  pretty hard to see.  How is Play in <u>Keebaugh</u> different from

9  <u>Register</u> in Temu?

10          MS. GOLD:  Well, first of all, I also did ant to

11  note that I think this screen is a little bit misleading in

12  the sense of you're not just seeing a white screen if you

13  were to go to Temu's website.  And if you were to look at

14  the original declaration, that's not what it shows.  So,

15  they're -- they're taking this tiny screenshot and

16  pretending that that's what the entire computer screen looks

17  like, but if you were to actually go to the -- to the

18  website and you go through and you look at the declaration,

19  the -- the whole background is filled with other eye

20  distracting text and images, what you are looking at.  And

21  then there is this small box within that much larger context

22  of the page, and I think it's very important, the Ninth

23  circuit has counseled, to look at the context of the page of

24  what you are doing when you're clicking the screen.  So,

25  you're already visually overwhelmed with plenty of stimuli

1 with various colors, various images going on, and this box

2 pops up and it's click the orange, get past this box.  I

3 mean --

4          THE COURT:  Well, is the box itself plain -- plain

5 white?

6          MS. GOLD:  I believe the box itself is plain

7 white.  But the --

8          THE COURT:  In other words, you're talking about

9 the visual stimuli before you get to this box, is that

10 correct?

11          MS. GOLD:  No.  It's on the same page as the box.

12 So --

13          THE COURT:  I'm confused.  Sorry.

14          MS. GOLD:  It's --

15          THE COURT:  I'm going to look at the original

16 exhibit.  Hang on just a second.

17          MS. GOLD:  Yeah.

18          MR. FELDMAN:  Your Honor, you can see this on

19 pages two and three of the Trin declaration, which I believe

20 is Document 17-1 on the record.  If you look at page two,

21 you see the white box pop up for the first registration

22 prompt you saw.

23          THE COURT:  Exhibit A -- Exhibit A of the Trin

24 declaration?  Okay.

25          MR. FELDMAN:  Correct.

11

1      THE COURT:  I'm taking a look at it right now.

2      (Pause.)

3      MR. FELDMAN:  It -- it's in the actual Trin

4  declaration itself.  You don't have to pull up the exhibit I

5  don't believe.

6      THE COURT:  Oh, I see.  Got it.  I was looking at

7  the exhibit.

8      MR. FELDMAN:  That's page two and three of the

9  Trin declaration.

10      THE COURT:  Okay.

11      MR. FELDMAN:  On page two you see the first

12  registration prompt and how it pops up above the screen in

13  -- in white and then page three you see the second

14  registration prompt you saw --

15      THE COURT:  Got it.

16      MR. FELDMAN:  -- and it pops up.

17      THE COURT:  So, what you're talking about, Ms.

18  Gold, is that sort of grayish background that's got the

19  product, whatever the product is that the person's looking

20  at?  Is that what you're talking about in terms of the

21  distraction?

22      MS. GOLD:  Yes.  Are you on page two or are you on

23  page three, just so we're --

24      THE COURT:  I'm on page two.  Page two and page

25  three have the same background.

12

1        MS. GOLD:  They do have the same background.

2        THE COURT:  It's a -- it's a -- it looks like a

3   cooler of some type, and then it's -- it's very faded.  So,

4   I can't tell exactly what it is, but it looks like a cooler

5   in the background.

6        MS. GOLD:  Right.  And, so, I believe that the --

7   the context of this screen is important, right.  You're

8   shopping.  You're saying, I'm going to buy this cooler.  I'm

9   going to add it to my cart, and I want to go through the

10  process and get -- get through this as quickly as possible.

11     And, so, you're already overloaded with a lot of

12  information about the cooler.  You're thinking about the

13  cooler.  I want to get to this cooler, checkout process as

14  quickly as possible, get to the part where I actually need

15  to do something.  And then you get this orange popup.  And

16  then the impulse that's intentionally designed, of course,

17  to be this way is to enter your phone number and then click

18  continue to --

19        THE COURT:  Well, is there any case law that says

20  that because the impulse is designed to make you want to

21  click on it that there's a problem?  I mean, isn't the test

22  under the Ninth Circuit the conspicuous nature of the

23  notice?  And here we have two.  I -- I understand what

24  you're talking about, the background, because I'm looking at

25  it right now.  But in terms of conspicuousness, what does

1  the impulsive nature of it have to do with the Ninth Circuit

2  standard?

3          MS. GOLD:  Well, certainly, I think that the fact

4  that there are dark patterns, dark patterns are beginning to

5  be talked about in the case law and in the legislature for

6  specifically designing an interface.

7          THE COURT:  I'm looking at the Game of Thrones in

8  Keebaugh, and that looks really dark.  And I'm looking at

9  the Temu, and I think, Okay, this is good because the white

10 is contrasting with the gray in the back.  So, it pops out.

11 And then the blue underlined Terms of Use and Privacy Policy

12 are at the bottom in a different color and a different --

13 and underlined against the white background.

14         MS. GOLD:  Fair enough, your Honor, although I

15 think in this first page I think there's a real difference

16 in the sense of you're not even -- we know that our client

17 entered their email from the declaration, and -- and you

18 don't even get to the -- the tiny font of "By continuing,

19 you agree to our terms of use" unless you were to look down

20 and click one of those buttons, one of the Facebook or the

21 Apple, the single sign-on buttons.  There's a spacial gap

22 which the Ninth Circuit has said is important between where

23 you click and where the terms are actually provided to the

24 consumer.  In other words, your attention can only -- only

25 needs to be on the middle of the page, whereas you have the

14

1  visual proximity -- that's the term that's used in Sellars

2  and in Berman, on the -- the Keebaugh page between the blue

3  button, and then immediately below it, you have the terms

4  that are provided where --

5        THE COURT:  Well, there's something between it.

6  There's Play in bright blue, and then there's a line that I

7  can't read, and then it has the Terms of Service below that.

8  So, there is some distance between Play and Terms of

9  Service.  There's one line between it, and I don't know.  I

10 can't see it clearly enough to see what it is.  It's too

11 small.

12       MR. FELDMAN:  Ironically -- ironically, your

13 Honor, that actually is the line that says, "By tapping

14 play, I agree the terms of service," and that's --

15       THE COURT:  I see.

16       MR. FELDMAN:  -- what the Ninth Circuit found

17 sufficient.

18       THE COURT:  Okay.

19       MS. GOLD:  Right.  So, it's right there.  It's --

20       MR. FELDMAN:  Which I think supports --

21       MS. GOLD:  You have to --

22       MR. FELDMAN:  -- Plaintiff's claim.

23       MS. GOLD:  You have to look at the blue button.

24 And, so, then your eye is also on that portion of the page.

25 And I think at least on this first page, it would -- it's

15

1  quite problematic to me that you don't have to look down.

2          THE COURT:  But on the -- this is an unusual case

3  because your client actually had to sign in twice.  In other

4  words, even if the first page didn't exist, the second page

5  looks like under Keebaugh is similar because the Register

6  button, the orange, then the Terms of Service are right

7  underneath the orange.  So, I don't know.  In Keebaugh and

8  Oberstein, there weren't two places where the person had to

9  press continue or play or register or whatever, right?

10          MS. GOLD:  Certainly I wouldn't call it unusual.

11  I think it -- it's in a lot of online interfaces.  In the

12  Bark Box case that we cited from the Central District, there

13  were multiple points where they informed customers about the

14  Terms of Use.

15          THE COURT:  But in terms of Keebaugh and

16  Oberstein, it differs from them in that it has two different

17  places, right?

18          MS. GOLD:  I don't remember any discussion in

19  Keebaugh or Oberstein about there being two different

20  places.

21          THE COURT:  Okay.

22          MS. GOLD:  There was --

23          THE COURT:  Mr. Feldman, do you know if there were

24  two different places in Keebaugh and Oberstein?

25          MR. FELDMAN:  I don't recall sitting here right

16

1  now, your Honor.  But what I -- what I would say is there's
2  no question that the -- I think the argument that Ms. Gold
3  just made about the terms, you know, two things.  Number
4  one, I think the gray background that we've talked about
5  that Ms. Gold highlighted only actually supports our
6  argument.  The white box that pops out when the background
7  is grayed on only de-emphasizes the surrounding Web pages
8  and emphasizes for the user the actual popup screen that
9  they receive for the Registration button.  I'm not aware of
10  any case law that says you need to take over the user's
11  entire full screen in order for a term to be conspicuous or
12  agreement to be conspicuous.  It just needs to be clear.
13      And, with regard to exactly where the prompt is, there
14  is no Ninth Circuit case law saying it must be in a specific
15  place.  Indeed, there are numerous cases, the <u>Lee v.</u>
16  <u>Ticketmaster</u> case that we've cited, that have enforced
17  notice of terms of use that were displayed three lines lower
18  than the action button.
19      The question, it's a fact-intensive inquiry of just
20  simply was there reasonably conspicuous notice to a
21  reasonable user.  And I think you can't really escape the
22  conclusion here that this user, Mr. Silva, saw not one but
23  two prompts.  They were conspicuous.  They were blue.  they
24  were bolded.  They're clear.  It's clearer than <u>Keebaugh</u>.
25  It's clearer than <u>Oberstein</u> or at least as clear if not

17

1  clearer.  There's just no daylight to allow for those cases

2  to be compelled to arbitration and this one somehow not.  I

3  mean, I don't think any of the case law that's been cited

4  says otherwise.

5            THE COURT:  Okay.

6            MR. FELDMAN:  In fact, it's squarely --

7            THE COURT:  All right.  I interrupted you, Mr.

8  Feldman.  So, why don't you continue with your presentation.

9  I'm going to do that because I want to -- I'd like to hear

10 from Ms. Gold right after to see what she has to say.

11           MR. FELDMAN:  No problem, your Honor.  I mean, I

12 think at the end of the day, I don't have much more to say.

13           THE COURT:  Okay.

14           MR. FELDMAN:  I think this is a very

15 straightforward case.  We provided the Plaintiff with

16 reasonably conspicuous notice of our terms under the law.

17 They consented by clearly the Continue and Register buttons.

18 We provided the notice.  They received it twice.  Either one

19 could be sufficient.  And, therefore, the arbitration should

20 be compelled under applicable case law, including the Ninth

21 Circuit's precedential decisions directly on point in just

22 the past 18 months.

23           THE COURT:  Okay.  All right.  Ms. Gold, I'll hear

24 from you.  And you can take this down from the Share screen.

25 Thank you.

18

 1          MR. FELDMAN:  Thank you, your Honor.

 2          MS. GOLD:  Thank you, your Honor.

 3      I wanted to make two quick points that were not

 4  addressed in Mr. Feldman's presentation.  One is that there

 5  is still evidentiary gaps here, and they've now had two

 6  bites at the apple to try to meet their burden of proof on

 7  the motion to compel to prove our Plaintiff agreed to these

 8  terms.  And -- and they're, frankly, doing a little bit of a

 9  shoddy job at it.

10      We specifically complained in our opposition that --

11  and in our objections that the declarant was simply

12  asserting things like Temu's records show that the Plaintiff

13  agreed to these terms, that this was the screen that the

14  Plaintiff saw, that the Plaintiff entered his email address.

15  But they're not actually providing those records.

16      What -- first of all, what records is the declarant

17  actually looking at?  Were those records kept in the

18  ordinary course of business?  Why haven't those records been

19  provided to us?  It violates all sorts of rules in terms of

20  the Best Evidence Rule and the rule against hearsay, et

21  cetera, et cetera, to just assume and conclude that this is

22  what the records show without giving us the opportunity to

23  test those assertions, because too many times we've seen it

24  where we get the records, and they don't match, that there

25  is a discrepancy between the email that was provided or that

19

there is some sort of issue between the sign up or they're
not quite as clear as a declarant might say they are.

So, that is problem number one is that this is still a
declaration that's lacking, and they've now been given two
opportunities to give you a better declaration with better
evidence actually proving Plaintiff agreed to this, and --
and they're still trying to float by.

The second issue that we haven't addressed is what this
arbitration provision actually says and what this
arbitration provision specifically says about batching and
what it -- what it tries to do to create this mass
arbitration process that is beneficial to Temu and not so
beneficial to consumers.  And, of course, you know, in the
background here, this is part of a --

THE COURT:  Is this an unconscionability argument?

MS. GOLD:  This is, your Honor.

THE COURT:  Okay.  So, I know that you contest
that the arbitrator has the ability to determine
unconscionability.  In other words, if I decide that the --
that there's an arbitration agreement and I send this to the
arbitrator, I know there's a dispute about whether or not
the arbitrator decides unconscionability or whether I decide
unconscionability.

I looked at the -- I looked at the agreement, and I got
to tell you it looks like the arbitrator has the ability to

20

1 determine unconscionability, not me.  And the case law is

2 pretty clear that I have to defer to that if I think that

3 the contract language is clear.

4        MS. GOLD:  Normally I would agree with that, your

5 Honor, but I would refer you to Judge Chen's very recent

6 decision.  It was in July in the <u>Pendolfi</u> -- <u>Pendolfi</u> I

7 believe is the case title, in which it was the same thing.

8 So, Judge Chen ended up finding that a batching provision

9 was unconscionable in the terms of service.  There was a

10 delegation provision, but he found that the delegation

11 provision was unconscionable for the same reason that the

12 batching provision was unconscionable.  So, you're almost

13 putting the cart before the horse by enforcing the

14 delegation provision vis-a-vis this batching procedure.  So,

15 you're going to have one arbitrator potentially decide

16 whether an arbitration agreement is unconscionable on behalf

17 of 100 consumers who may or may not even have like claims

18 necessarily on that specific issue because I don't know.

19 The batching provision is vague.  If we're just challenging

20 that threshold issue at the outset, is that -- are we

21 allowed to batch even if the claims are about a data breach

22 or -- I'm not sure how that's going to work because it's

23 very vague.

24        So, Judge Chen really does do a --

25        THE COURT:  I'll take a look at it.

1          MS. GOLD:  -- complete analysis.

2          THE COURT:  Yes.  Is that case on appeal?

3          MS. GOLD:  I think it is, your Honor.

4          THE COURT:  I can't imagine that would be an

5    appealable issue.

6          MR. FELDMAN:  It is.

7          THE COURT:  Okay.

8          MS. GOLD:  It is.  Although, I believe I heard

9    once that Judge Chen was the least overturned jurist in the

10   Ninth Circuit.  So, we'll see if that ends up being the case

11   or not.  Regardless, he --

12         THE COURT:  I'm not sure that's accurate.

13         MS. GOLD:  It might not be anymore, but he

14   certainly provides a very in-depth analysis.  It's lengthy.

15       And on the specific provision, there is two specific

16   aspects that I have a problem with, and all -- in the

17   broader context of the Ninth Circuit, I think it will be

18   very interesting because all of these batching provisions

19   are very new, and there's not a lot of case law on it, but

20   the couple of cases that have come out about batching

21   provisions -- and they're all somewhat different, to try to

22   prevent mass arbitrations -- have been largely unfavorable.

23   I'm not sure if I'm aware of a case that has held that a

24   batching provision was fine.  The best -- the most I've --

25   I've seen is, you know, it's for the arbitrator to decide.

1      So, the first point is it attempts to penalize
2  attorneys for having multiple clients or for clients
3  choosing the same attorneys or for attorneys from choosing
4  to work together on a specific case.  And California law is
5  very clear and is very strong on this point, that you cannot
6  restrict an attorney's practice of law, that when you have
7  an agreement that tries to impinge on an attorney's ability
8  to represent a client, that is unethical, and that is also
9  going to be unconscionable for the same reasons.  And that's
10 exactly what they're trying to do here.

11     So, their provision is not based on the types of claims
12 consumers raise.  It's based on who the counsel are and who
13 you're getting -- even more vaguely, who you're getting
14 assistance from, which I -- I don't know what that means.

15     So, if I -- I did receive -- and that's the basis of my
16 declaration in this case -- a call from another firm that is
17 mass arbitrating against Temu similar claims.  I don't know
18 if that call constitutes assistance for my clients in this
19 case or not, but maybe it will in the future, and the --
20 they let me know the existence of these mass arbitrations,
21 but if I were to try to work together with these attorneys
22 in any sort of way, certainly more formally, then my clients
23 could get sucked into the batch that's proceeding already on
24 behalf of those other clients.  And, similarly, if I attempt
25 to obtain more clients or if more clients contact me about

23

1 similar issues against Temu, then they are suddenly going to
2 be batched with this other group.  And, so, you're
3 penalizing clients and attorneys simply for the fact that an
4 attorney represents more than 25 clients with similar claims
5 against Temu, and that's problematic --
6            THE COURT:  Okay.
7            MS. GOLD:  -- under California law.
8            THE COURT:  Let me hear from Mr. Feldman on your
9 last two points.  Thank you.
10           MR. FELDMAN:  Thank you, your Honor.  So, let me
11 briefly address each point.  So, the first I believe is
12 about the declaration.  The second is about the
13 unconscionability batching.
14      So, on the declaration, I would say a couple of things.
15 First of all, I don't think there's been any dispute, in
16 fact, Ms. Gold made it clear in response to your questions
17 at the beginning of the hearing that her client -- there is
18 no dispute that this is the registration flow that he went
19 through.  There's no evidentiary basis to believe that he
20 didn't go through this dispute.  So, I think this is kind of
21 a -- a side show.
22      But, to be clear, the Trin declaration makes clear from
23 a person with knowledge about exactly what Mr. Silva here
24 saw.  It's the exact type of declaration that courts within
25 this Circuit have relied on over and over and over again in

1    many cases that we cited in our briefing, and it makes clear

2    that at -- in February of 2024, when Mr. Silva signed up,

3    this is exactly what he saw.  This is what a user would see.

4    And, this is, in fact, what he did see as you looked at on

5    pages two and three of the declaration that we just went

6    through.  We don't think there's any dispute here, and I

7    haven't heard any dispute here.  That said, out of an

8    abundance of -- I wouldn't even say an abundance of caution,

9    but just to put any doubts to rest, we issued as well a

10   supplemental declaration with our reply brief, which is

11   permitted under Rule 73(c), as your Honor's aware, and made

12   clear that to the extent they had any doubt about whether he

13   was, you know, very clear on exactly what Mr. Silva saw, we

14   were going to make clear that, yes, this is exactly what he

15   saw at the specific time period.  He saw both prompts.  He

16   agreed to both prompts.  And courts in this Circuit

17   regularly rely on not just the original declarations but the

18   supplemental declarations in granting motions to compel

19   arbitration of the exact type we have here so --

20        THE COURT:  I don't have a problem with the

21   evidence.  I think that the evidence --

22        MR. FELDMAN:  Okay.

23        THE COURT:  -- is sufficient to show --

24        MR. FELDMAN:  Okay.

25        THE COURT:  -- the terms.

25

1          MR. FELDMAN:  So --

2          THE COURT:  Let's talk about the batching and the

3    unconscionability.

4          MR. FELDMAN:  Yeah.

5          THE COURT:  That's interesting to me.

6          MR. FELDMAN:  Okay.  So, good.  So, let me -- let

7    me -- let me try to hits two points there.  First, at the

8    threshold issue that your Honor put her finger on, which I

9    think is exactly right, the arbitration agreement includes

10   an express delegation clause delegating issues to the

11   arbitrator, essentially all issues to the arbitrator.  I

12   think the question for this Court is is there a valid

13   agreement, was there a reasonably conspicuous notice of the

14   terms, did he assent.  If so, all other issues should go to

15   the arbitrator.  There's the Fly Low Falcon v. Amazon Ninth

16   Circuit case from 2024, which has made clear that when the

17   parties have clearly and unmistakably delegated questions to

18   the arbitrator, the court need not conduct further inquiries

19   beyond the existence of the arbitration agreement.  So, once

20   your Honor finds there is an agreement, that should be the

21   end of it, and we think that's clear.  So, there's no need

22   to go further.

23     But let's just say you did for the sake of argument and

24   to respond to Ms. Gold's points.

25          THE COURT:  Yeah.  What about Pendolfi?  I'm

1  curious to see what you have to say about that.

2          MR. FELDMAN:  Yes.  So, two things.  First of all,

3  I'd just have to say you'd have to obviously find for any

4  term to be unconscionable, both procedural and substantive

5  unconscionability.  And, to be clear, the only argument that

6  the other side has made about how this contract could be

7  procedurally unconscionable is that it's an adhesion

8  contract.  That's what they argue in their briefing.  And,

9  to be clear, the Ninth Circuit in a precedential decision in

10 2016, the Mohammed v. Uber Technologies case, which we've

11 cited, made very clear that "An arbitration agreement is not

12 adhesive" -- and I'm quoting it -- "if there is an

13 opportunity to opt out of it."  And there is no dispute here

14 that our arbitration agreement provided for 30 days for Mr.

15 Silva or anyone else to opt out of the agreement.  So, we

16 think under binding Ninth Circuit precedent, there simply is

17 not procedural unconscionability, and that ends any inquiry

18 that this Court would ever need to make, even if the term --

19 these issues were not delegated to the arbitrator, which

20 they are.

21      But let's just say you got beyond both of those

22 questions.  To be clear, the cases that Ms. Gold cites

23 actually talk about bellwether provisions, not specific

24 batching provisions like we're talking about here -- that's

25 not their focus -- and the narrow circumstances in which the

27

1  -- the bellwether provision can be found unconscionable.
2  And let me just describe what the difference is because the
3  difference is incredibly important.

4      The bellwether provisions that those cases were talking
5  about basically say, Hey, you know what?  If there is, you
6  know, 500 cases that are filed by the same firm that are a
7  bunch of different plaintiffs but arise out of the exact
8  same facts, we're going to actually send let's say 10, 20 of
9  them at a time to be decided by an arbitrator.  That
10  arbitrator's going to act -- that -- those are going to be
11  bellwether cases.  And, you know, after those are decided,
12  we'll move on to the next ones with the law that we find.
13  And then after those are decided, we'll move on to the next
14  ones.  And what courts, including Judge Chen, and others
15  have said about provisions like that is, Well, we have some
16  concerns about that because there could be some plaintiff
17  who files a case and they might not be able to have their
18  arbitration heard for seven years because you're going 10 at
19  a time through this bellwether provision, and you might be
20  number, you know, 9072 on the list.  But two things about
21  that.  Number one, most importantly, that doesn't exist
22  here.  That's just -- there's no argument that's not present
23  in this case.  What we have --

24          THE COURT:  Are you saying that the facts of this
25  case are different from <u>Pendolfi</u>?

28

1          MR. FELDMAN:  Yes.  We don't have a bellwether
2  provision.  We have a -- just a batching provision that
3  specifically says, importantly, that the cases that would be
4  batched together would be heard "concurrently".  So, there's
5  no dispute that even if the cases were batched -- and I just
6  have to make clear at this point that we are unaware of any
7  evidence that this case would be batched with anything else.
8  I mean, Ms. Gold talked about some secret phone call with
9  some other counsel that we're not aware of, but I can tell
10 you from my clients that we're not aware of anything this
11 would be batched with.  And, so, there's not even standing
12 to raise this argument.  But, to be clear, the batching
13 provision says all the matters would be handled
14 concurrently, just the way you'd have if cases were
15 consolidated in a Federal Court.  So, it removes all of the
16 concerns that you see in those bellwether cases where there
17 would be delay.  There wouldn't be any delay.  But, again --
18 so, I think that answers the substantive unconscionability
19 question and why there clearly is none here because that
20 delay would never happen.  But, again, there's no evidence
21 at all that that's even at play in this case whatsoever.
22 And we don't think he'd even get to substantive
23 unconscionability.
24          THE COURT:  All right.  I'll go back and look at
25 the language.  I'll read _Pendolfi_ especially.

29

1      So, thank you for the argument.  I'm going to take this

2 under submission.  I'm going to go look at a couple of

3 things, and then I'll issue a ruling.

4            MR. FELDMAN:  Thank you, your Honor.

5            THE CLERK:  We're in recess.

6      (Proceedings adjourned at 10:02 a.m.)

30

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16            Echo Reporting, Inc., Transcriber

17               Tuesday, October 8, 2024

18

19

20

21

22

23

24

25