UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELI SILVA,<br><br>   Plaintiff,<br><br> v.<br><br>WHALECO, INC.,<br><br>   Defendant. | Case No. 24-cv-02890-SK<br><br>**ORDER ON MOTION TO COMPEL ARBITRATION**<br><br>Regarding Docket No. 17 |

This matter comes before the Court upon consideration of the motion to compel arbitration filed by Defendant WhaleCo, Inc. ("WhaleCo"). For the reasons stated below, the Court GRANTS that WhaleCo's motion to compel and STAYS this action pending arbitration.

## BACKGROUND

Defendant is WhaleCo, Inc., which operates Temu—an online retailer that makes, sells, and markets a variety of everyday use products and household necessities through a public website where it also advertises its products. (Dkt. No. 1, ¶¶ 7, 16.) Plaintiff is Eli Silva, an individual who made several purchases of WhaleCo products through the website, temu.com. (*Id.* at ¶¶ 8, 15.) The gravamen of Plaintiff's Complaint involves allegations that WhaleCo employed strikethrough advertising tactics that indicated that certain products were on sale but, in reality, were being sold at regular price. (*Id.* at ¶¶ 8, 11.) Other tactics included a countdown that informed customers when such purported sales would expire. (*Id.* at ¶ 8.)

In February 2024, when making purchases on the Temu website or Temu mobile application, prospective users were required to accept Temu's Terms of Use. (Dkt. No. 17-1, July 20204 Declaration of Michale Trinh ("July 2024 Trinh Decl."), ¶ 2; Dkt. No. 20-3, September

1  2024 Declaration of Michael Trinh ("September 2024 Trinh Decl."), ¶ 3.)[1]  As Declarant Michael
2  Trinh, a Customer Service Manager at WhaleCo Inc. since October 2022, explains, when a person
3  registers for a Temu account, they are shown two registration prompts.  (*Id*. at ¶ 3; Dkt. No 20-3,
4  September 2024 Trinh Decl., ¶ 4.)  The first registration prompt includes (i) a field to register for
5  an account by entering an email or a phone number, along with a corresponding "Continue" button
6  to affirm assent; and (ii) alternative buttons allowing the user to "Continue" by instead registering
7  through their existing Google, Facebook, Apple, or X (Twitter) account.



---

[1] Both parties have included declarations for the Court's consideration; WhaleCo has also included exhibits of two registration prompts that were in use when Plaintiff signed up for Temu and the relevant Terms of Use.  While neither party has formally moved for judicial notice or incorporation, the Court *sua sponte* takes judicial notice of the declarations and incorporates the registration prompts and Terms of Use.  The Court has considered Plaintiff's objections (Dkt. No. 19-3) and overrules them.  (*See* Dkt. No. 20-3); *see e.g., Aggarwal v. Coinbase, Inc*., 685 F. Supp. 3d 867, 871-74 (N.D. Cal. 2023) (relying on same type of evidence in enforcing arbitration agreement).

2

1   (Dkt. No. 17-1, July 2024 Trinh Decl., ¶ 4.)

2   After a user enters their email address or phone number and the clicks the "Continue"
3   button, a second notice relating to consent to Temu's Terms of Use is displayed on a second
4   registration prompt.  (*Id*. at ¶ 6.)



21   (*Id*.)  A user then creates a password for the user's Temu account and clicks the "Register" button,
22   immediately above hyperlinks to the Terms of Use and Privacy Policy.  (*Id*. at ¶ 7.)

23   According to Trinh, "[a]fter a user assented to Temu's Terms, the Terms continued to be
24   available to them as a hyperlink in the footer of Temu's website and within the menu of Temu's
25   mobile application."  (*Id*. at ¶ 8.)  In other words, registered Temu users, including Plaintiff, was
26   required to assent to Temu's Terms of Use each time they input their credentials to log into
27   Temu's website or mobile application.  (*Id*. at ¶ 9.)  Further, "[o]nly after a user assented to

Temu's Terms of Use were they able to buy products, follow brands, leave product reviews, and receive notifications—among other methods of interacting with Temu." (*Id*. at ¶ 10.)

According to Temu's records, on February 21, 2024, Plaintiff entered his email address and clicked the "Continue" button; he then created a password for his Temu account and clicked the "Register" button immediately above the Terms of Use hyperlink. (*Id*. at ¶ 11; Dkt. No. 20-3, September 2024, Trinh Decl. ¶¶ 6-8.) Trinh explains that, in Temu's regularly conducted business activity, Temu maintains database of account records, including records of when a user first registers for an account, the device they used to register, how the user chose to register, the number of subsequent logins associated with the account, and the purchase history of the account. (Dkt. No. 20-3, September 2024 Trinh Decl., ¶ 5.) Thus, Temu's records show that on February 21, 2024, Plaintiff was shown both registration prompts on the Temu website and registered for an account with his email address. (*Id*. at ¶ 9.) Plaintiff then completed the registration process by setting a password for his account and clicking "Register." (*Id*.)

In response to WhaleCo's motion to compel arbitration, Plaintiff filed a declaration wherein he admits that on February 21, 2024, he bought two electric massage guns from Temu through its website. (Dkt. No. 19-2, Declaration of Eli Silva ("Silva Decl."), ¶ 2.) Plaintiff believed he was taking advantage of a deal, but he states that he would not have bought the massage guns had he known they were not on sale. (*Id*. at ¶¶ 3-5.) In Plaintiff's declaration, he states that "[w]hen I registered an account, I was not aware nor presented with Temu's Terms and Conditions." (*Id*. at ¶ 6.) Plaintiff did not recall whether he saw the two registration prompts identified by Defendant. (*Id*. at ¶ 7.)

WhaleCo now moves to compel arbitration and to stay this action pending the arbitration. (Dkt. No. 17.) All parties have consented to the jurisdiction of a federal magistrate judge. (Dkt. Nos. 8, 13.) On October 7, 2024, the Court held a hearing on the matter.

## ANALYSIS

**A.   Legal Standard Applicable to Motions to Compel Arbitration.**

Pursuant to the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2. "If an agreement exists, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that [it] *shall* direct the parties to proceed to arbitration.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1193-94 (9th Cir. 2024) (emphasis in original), quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

If a party ignores its agreement to arbitrate, "the other party may ask a court to issue 'an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Id.* at 1194, quoting 9 U.S.C. § 4. The FAA "requires the court to enforce the arbitration agreement in accordance with its terms" and limits the court's role to deciding whether: (1) "a valid agreement to arbitrate exists" between the parties and (2) the scope of the agreement encompasses the claims. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "The party seeking to compel arbitration 'bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'" *Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005, 1013 (9th Cir. 2024), quoting *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023).

Arbitration is "a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Coinbase, Inc. v. Suski*, ___ U.S. ___, 144 S. Ct. 1186, 1192 (2024), quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Parties are free to "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Id.*, quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). "An agreement to allow an arbitrator to decide whether a dispute is subject to arbitration—*i.e.*, its arbitrability—'is simply an additional, antecedent agreement . . ., and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Id.*, quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010).

Therefore, "[t]he presence of a delegation clause further limits the issues that a court may decide." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). "When the parties have 'clearly and unmistakably' delegated questions regarding arbitrability to the arbitrator, the court need not conduct further inquiries beyond the existence of the arbitration

5

agreement." *Fli-Lo Falcon, LLC*, 97 F.4th at 1194, citing *Rent-A-Center*, 561 U.S. 63, 68-70 (2010).

**B.     Formation of Agreement to Arbitrate.**

Here, Plaintiff contends that no agreement was made between the parties because WhaleCo has failed to prove that Plaintiff was on notice of Temu's Terms of Use. (*Id*. at 9-14.) Plaintiff also argues that Temu's Terms of Use are unconscionable and unenforceable and that the Court should make a determination on unconscionability in the first instance. (*Id*. at 15-20.) WhaleCo responds by arguing that Plaintiff was on notice and accepted Temu's Terms of Use. (Dkt. No. 20, 2-8.) Then, WhaleCo argues that all issues regarding any alleged unconscionability of the arbitration agreement have been delegated to the arbitrator. (*Id*. at 9-10.) Finally, in any event, WhaleCo contends that the arbitration agreement is neither procedurally nor substantially unconscionable. (*Id*. at 10-14.) The Court finds that Plaintiff accepted Temu's Terms of Use, that the arbitration agreement is valid and covers Plaintiff's claims, and that the issue of unconscionability has been delegated to the arbitrator.

The parties agree that the Court is tasked with reviewing whether a valid agreement to arbitrate exists and, if it does, whether the agreement encompasses the dispute at issue. (*See* Dkt. No. 19, 8-9.) Thus, the Court turns to the issue of whether Plaintiff entered into an agreement with Temu. As discussed further below, the Court finds that Plaintiff accepted Temu's Terms of Use through its website's "sign-in wrap" process, which put Plaintiff on constructive notice of its Terms of Use.

Under California law, there "must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Keebaugh*, 100 F.4th at 1013-14, quoting *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512-13 (9th Cir. 2023). As relevant here, a "sign-in wrap" agreement "may be an enforceable contract based on inquiry notice if '(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Id*., quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

6

1       First, the Court finds that Temu provided reasonably conspicuous notice of its Terms of Use. To be conspicuous, notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856. "While terms may be disclosed through hyperlinks, the presence of a hyperlink 'must be readily apparent,' and '[s]imply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists.'" *Keebaugh*, 100 F.4th at 1014, quoting *Berman*, 30 F.4th at 857.

The Ninth Circuit's recent decisions in *Oberstein* and *Keebaugh* are instructive. In *Oberstein*, the Court held that notice was conspicuous where users were presented with the Terms of Use three times (when creating an account, signing into an account, and completing a purchase), and "the 'Terms of Use' hyperlink [was] conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent." 60 F.4th at 515-16. The notice at issue in *Keebaugh* was arguably less conspicuous because users only encountered the "Terms of Use" at the sign-in stage and because the small white font of the "Terms of Use" hyperlink was set against a black background below a scene from Game of Thrones, which created more visual distraction. *See Keebaugh*, 100 F.4th at 1010. Nevertheless, the "Terms of Use" were reasonably conspicuous because they were "displayed directly . . . below the action button," in a contrasting font color, and with "[c]ustomary design elements denoting the existence of a hyperlink." *Id.* at 1020-21, quoting *Oberstein*, 60 F.4th at 516 and *Berman*, 30 F.4th at 857.

A comparison of Temu's notice with the notices at issue in *Oberstein* and *Keebaugh* reveals that Temu's notice clearly passes the test. As in *Oberstein* and *Keebaugh*, Temu users are presented with hyperlinks to "Terms of Use and Privacy Policy" which are displayed directly below the "continue" button. (Dkt. No. 17-1, July 2024 Trinh Decl., ¶ ¶ 4, 6.) The language of "Terms of Use and Privacy Policy" is large enough to read, and it is capitalized and underlined in blue, which stands out from the surrounding text. (*Id*.) This denotes the existence of a hyperlink to a reasonably prudent internet user. And like the notice at issue in *Oberstein*, Temu users encounter the "Terms of Use and Privacy Policy" more than once during the registration process. (*Id*.) Further, Temu registration pop-up windows are uncluttered and contain no extraneous

7

1   information. (*Id.*) Temu further reduces distractions by greying out the product purchase page in
2   the background. (*Id.*) Finally, the largest visual on the window is a big orange button with the
3   word "Continue" on it, leaving no mistake that by clicking the Continue button, a user would be
4   agreeing to Temu's Terms of Use. (*Id.*)[2]

Second, the Court finds that Plaintiff unambiguously manifested his assent to those terms. Plaintiff created an account, which required clicking both the Continue and Register buttons. Indeed, Plaintiff admits in his declaration that he "registered [for] an account," (Dkt. No. 19-2, Silva Decl., ¶ 6,), of which WhaleCo has specific records. (Dkt. No. 20-3, September 2024 Trinh Decl., ¶ 9.) Plaintiff attempts to gloss over this fact by asserting that he was "not aware nor presented with Terms and Conditions." (*Id.*) Moreover, Plaintiff states that he did not recall the registration window prompts when he registered. (*Id.* at ¶ 7.)

As should be apparent, the definition of a sign-in wrap agreement is that the Terms of Use are *available* to a prospective user, usually through a hyperlink. In other words, a valid sign-in wrap agreement does not require that the Terms of Use appear separately to a consumer unless he or she clicks the hyperlink. Thus, Plaintiff's statement that he was not presented with Temu's Terms of Use is of no moment.

Plaintiff's statements that he was not aware of Temu's Terms of Use or that he did not recall the exact registration window prompts are similarly unpersuasive. Basic principles of contract law provide that "[i]f a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless." *Whalen v. Facebook, Inc.*, No. 20-cv-06361-JST, 2022 WL 19934419, at *3 (N.D. Cal. April 11, 2022), quoting *Blau v. AT & T Mobility*, No. C 11-00541 CRB, 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012). The Court finds that Plaintiff's

---

[2] Plaintiff's cited authority on this issue is distinguishable or otherwise inapposite. For example, *Berman* involved a website registration prompt with a terms and conditions hyperlink that was several font sizes smaller than most of the lengthy registration prompt, and the terms and conditions link were in all grey, which does not necessarily indicate a hyperlink. 30 F.4th at 861. The only other authority worth mentioning is *Chabolla v. ClassPass Inc.*, No. 23-cv-00429-YGR, 2023, WL 4544598 (N.D. Cal. June 22, 2023). There, the defendant's notice of terms appeared on a separate, later screen than the ones in which users created accounts and entered credit card information, which the district court found problematic because "[the defendant] previously presented a much more limited set of 'Terms & Conditions' on several of the preceding webpages[.]" *Id.* at *4.

8

declaration does little to countervail the preponderance of evidence that WhaleCo has provided that Plaintiff unambiguously manifested his ascent to Temu's Terms of Use when he, undisputedly, registered for an account.

**C.   Agreement's Requirement for Arbitration.**

Having concluded that Plaintiff is bound to Temu's Terms of Use, which contain an arbitration agreement, the Court likewise concludes that all of Plaintiff's claims are subject to the Terms of Use. As relevant here, Temu's arbitration agreement provides:

> Subject to the terms of this Arbitration Agreement, you and we agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each, a "Dispute") will be resolved by binding arbitration . . . .

(Dkt. No. 17-2, p. 10.) Plaintiff brings four claims: a violation of California's Unfair Competition Law, a violation of California's Consumer Legal Remedies Act, False and Misleading Advertising, and Unjust Enrichment. (Dkt. No. 1, 16-21.) Each of these claims involves allegations that WhaleCo, via the Temu website, employed strikethrough advertising tactics that indicated that certain products were on sale but, in reality, they were being sold at regular price. (*Id*. at ¶¶ 8, 11.). Therefore, the arbitration agreement covers the claims at issue.

**D.   Unconscionability Delegated to Arbitrator.**

The final matter before the Court is the delegation of the issue of unconscionability. Plaintiff begins with an odd pronouncement that should this matter go to arbitration, Plaintiff intends to raise the issue of enforceability of the arbitration agreement with the arbitrator. (Dkt. No. 19, 8.) Plaintiff then argues that, because in his view he and Temu never entered into an agreement, the delegation clause cannot be enforced. (*Id*.) Last, Plaintiff states that "the issue of enforceability cannot be delegated to an arbitrator because the delegation clause itself is unconscionable and unenforceable." (*Id*. at 9.) While Plaintiff is free to bring the issue of enforceability to the arbitrator, Plaintiff is otherwise wrong on this issue.

As relevant here, the arbitration agreement contains the following provision regarding authority to the arbitrator:

> **19.7 Authority to Arbitrator**. The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement . . . .

(Dkt. No. 17-2, p. 11.) As analyzed above, the Court finds that Plaintiff and Temu entered into an agreement when Plaintiff agreed to Temu's Terms of Use by creating a Temu account. Therefore, that argument is without merit.

Regarding Plaintiff's final argument, the Court takes Plaintiff's position to be that the Court cannot enforce the delegation clause because the delegation clause itself is unconscionable. Yet Plaintiff has not carried his burden of proving that the delegation clause is unconscionable. *See Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021). Plaintiff's main argument in support of unconscionability concerns a provision providing for the concurrent batching of similar claims.[3] (Dkt. No. 19, pp. 16-18.) Plaintiff argues this provision will delay resolution of claims and subsequently have a chilling effect on potential plaintiffs. (*Id.*) In support of this argument, Plaintiff cites two cases concerning a different type of procedure in arbitration agreements — bellwether provisions — which impose limits on the number of cases that can be tried at one time and consequently delay litigation for the next batch of litigants. (*Id.*, citing *MacClelland v. Cellco Partnership*, 609 F. Supp. 3d 1024 (N.D. Cal. July 1, 2022) and *Pandolfi v. AviaGames, Inc.*, 2024 WL 3558853 (N.D. Cal. July 26, 2024).) Courts found those bellwether provisions to be unconscionable because litigants could not prosecute their claims until earlier groups of litigants had resolved their claims and, thus, this system created undue delay and caused an *a priori* chilling effect. *See MacClelland*, 609 F. Supp. 3d at 1040-44; *Pandolfi*, 2024 WL at *5-8. However, Temu's arbitration clause contains no such bellwether requirement. Rather, Temu's arbitration clause provides for the *concurrent* batching of like claims (Trinh Decl., Ex. A § 19.9), eliminating any concern that litigants' claims will be stalled until prior batches of claims are

---

[3] The Terms state that "in the event that there are twenty-five (25) or more individual Arbitration Notices of a substantially similar nature filed against us by or with the assistance of the same law firm, group of law firms, or organizations, within a thirty (30) day period, AAA shall . . . administer the arbitration demands in batches of 100 Arbitration Notices per batch . . . concurrently." (Trinh Decl., Ex. A § 19.9).

10

1  resolved.  As Plaintiff has not offered any authority or convincing argument suggesting that
2  *concurrent* claim batching results in unconscionable delay, he has not carried his burden of
3  demonstrating unconscionability.
4        In any event, the Court finds that the delegation provision clearly and unmistakably
5  delegates to the arbitrator the issues of "enforceability, revocability, scope, or validity of the
6  Arbitration Agreement or any portion of the Arbitration Agreement."  (Dkt. No. 17-2, p. 11.)
7  Therefore, the Court concludes that the issue of enforceability — and therefore unconscionability
8  of the delegation clause and the arbitration agreement itself — are reserved for the arbitrator.

## CONCLUSION

For the foregoing reasons, the Court GRANTS WhaleCo's motion to compel arbitration and STAYS this action pending the arbitration.  The Court FURTHER ORDERS that the parties shall file a joint status report regarding the status of the arbitration proceedings every four months hereafter until the arbitration proceedings are completed.

**IT IS SO ORDERED**.

Dated: October 10, 2024

_____
SALLIE KIM
United States Magistrate Judge

11